710 A.2d 563

ARLENE KEIL, PLAINTIFF–RESPONDENT, v.
NATIONAL WESTMINSTER BANK, INC.,
DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted April 22, 1998—Decided May 15, 1998.

474

476

Before Judges BAIME, BROCHIN and WEFING.

*Stanley, Powers & Matyola,* attorneys for defendant–appellant (*Jeffrey T. Kosten,* on the brief).

*Sapiro & Gottlieb,* attorneys for plaintiff–respondent (*Alan Gottlieb,* on the brief).

The opinion of the court was delivered by

BAIME, P.J.A.D.

Plaintiff Arlene Keil brought this action claiming that defendant National Westminster Bank, Inc. (National Westminster) had improperly allowed her husband to withdraw funds from a passbook account she maintained for her mother.[1] The Law Division granted plaintiff's motion for summary judgment. National Westminster appeals. We affirm in part and reverse in part.

## I.

The material facts are not in dispute. On September 27, 1978, plaintiff opened a passbook savings account at the Bay Ridge branch of National Bank of North America (NBNA), National Westminster's predecessor, located in Brooklyn, New York. Plaintiff acted as custodian of the account for her elderly mother, Esta L. Durante, who for many years had been institutionalized as a result of severe depression. The passbook account was established for the benefit of plaintiff's mother who was entitled to receive pension benefits from the Veterans Administration. The withdrawal agreement, which was executed by plaintiff and representatives of NBNA and the Veterans Administration, stated that plaintiff was the custodian of the account for the benefit of her mother, and that the account was to be used for deposits of her mother's pension benefits. The agreement further provided that funds deposited in the account could be "withdrawn only with the written consent of the Veterans Services Officer of the Veterans Administration Regional Office . . . or [his] designee."

Plaintiff was required to file periodic reports with the Veterans Administration regarding the account showing "all deposits and withdrawals." In 1988, plaintiff's husband began performing the annual accounting and preparation of income taxes for Durante's

---

[1] The correct name of National Westminster Bank, Inc. is Fleet Bank National Association. Plaintiff moved to correct defendant's name, but the record contains no order disposing of the motion.

account. As of that year, approximately $96,793 had been deposited in the account, and no funds had been withdrawn.

Beginning in November of 1988, plaintiff's husband began secretly to withdraw funds from the passbook account in order to pay his gambling debts. The record contains conflicting evidence pertaining to whether the withdrawals were made in Brooklyn, New York or New Jersey, where the Keils had moved. However, it is undisputed that plaintiff was wholly unaware of her husband's defalcations, and neither benefitted from these withdrawals nor authorized them. By late 1990, the account was depleted. Richard had withdrawn $101,150.

Plaintiff first learned of the unauthorized withdrawals from the account in March 1994 when she was questioned by the Inspector General's Office of the Veterans Administration. It soon became apparent that plaintiff was not involved. Richard ultimately admitted that he took the money, and was indicted by a federal grand jury. The indictment alleged that Keil embezzled the money "in Middlesex County, New Jersey and elsewhere." Keil pled guilty to the charge in the United States District Court for the District of New Jersey, and was sentenced to five years probation upon the condition that he make restitution to the Veterans Administration. He subsequently died.

The Veterans Administration did not remove plaintiff as a custodian of the account. After plaintiff filed her complaint, however, the Veterans Administration directed that any recovery is to be "placed in a legal custodian account with a corporate guardian for the benefit of Est[a] Durante." Other than this stipulation, the Veterans Administration has "take[n] no position" on the merits of plaintiff's lawsuit.

The parties filed cross-motions for summary judgment. Plaintiff argued that New York law applied and that its banking statutes imposed strict liability on a lending institution for losses caused by unauthorized withdrawals. National Westminster asserted that New Jersey law was controlling and that the applicable statutes insulated banks from losses resulting from unautho-

rized withdrawals. The bank argued, alternatively, that New York's statute of limitations barred plaintiff from recovering much of her claim. The Law Division granted plaintiff's motion for summary judgment, finding that New York banking statutes applied. The court made no determination concerning National Westminster's contention pertaining to the statute of limitations. The judgment entered recites the court's finding as to National Westminster's liability, but does not set forth a monetary award.

■ National Westminster argues: (1) plaintiff lacked standing and should not have been permitted to assert a claim on behalf of her mother, (2) New Jersey substantive law should have been applied, and (3) if New York law is applicable, much of plaintiff's claim is barred by reason of the expiration of the limitations period. We reject National Westminster's attack upon plaintiff's right to sue on behalf of her mother. *R.* 2:11–3(e)(1)(E). Although plaintiff should have brought suit in a representative capacity on behalf of her mother, and while we do not endorse her gross inattention to our rules of practice, we are satisfied that no prejudice resulted. In light of the Veterans Administration's direction that any recovery is to be placed in a custodian's account with a corporate guardian for the benefit of plaintiff's mother, we are satisfied that Mrs. Durante's rights will be fully protected. Resolution of the remaining issues requires full explication.

## II.

Were the law congruent in New Jersey and New York, we would not be confronted with a choice of law problem. We thus examine the banking laws of the two jurisdictions.

At the time of the unauthorized withdrawals, *N.J.S.A.* 17:9A–227 was in effect. That statute provided in pertinent part as follows:

A. No banking institution shall be liable to a depositor for any payment upon any receipt, draft or other order for the withdrawal or payment of money from the depositor's account upon which the signature of any party was forged, or which was made, drawn or indorsed without authority, or which was raised or otherwise

materially altered, if payment is made upon presentation of the pass book or other evidence of credit or deposit furnished by the banking institution and if such withdrawal or payment is entered therein, *unless within two years after such entry the depositor shall notify the banking institution in writing that the signature of a party to the receipt, draft or other order was forged, or that it was made, drawn or indorsed without authority, or that it was raised or otherwise materially altered.*

B.  This section shall apply only to savings accounts.

[*Ibid.* (emphasis added).]

Plaintiff formally contacted National Westminster regarding the unauthorized withdrawals on January 12, 1996. Under *N.J.S.A.* 17:9A–227, plaintiff's claim was barred because she did not notify the bank within two years of the dates of the unauthorized withdrawals.

We note, however, that *N.J.S.A.* 17:9A–227 was repealed effective June 1, 1995. *See L.* 1995, *c.* 28, § 14. At the same time, the Legislature amended *N.J.S.A.* 12A:4–406 to read as follows:

a.  A bank that sends or makes available to a customer a statement of account showing payment of items for the account shall either return or make available to the customer the items paid or provide information in the statement of account sufficient to allow the customer reasonably to identify the items paid. The statement of account provides sufficient information if the item is described by item number, amount, and date of payment.

. . . .

c.  *If a bank sends or makes available a statement of account or items pursuant to subsection a. of this section, the customer must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized. If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.*

d.  *If the bank proves that the customer failed, with respect to an item, to comply with the duties imposed on the customer by subsection c. of this section, the customer is precluded from asserting against the bank:*

(1) the customer's unauthorized signature or any alteration on the item, if the bank also proves that it suffered a loss by reason of the failure; and (2) the customer's unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank if the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, not exceeding 30 days, in which to examine the item or statement of account and notify the bank.

e. If subsection d. of this section applies and the customer proves that the bank failed to exercise ordinary care in paying the item and that the failure substantially contributed to loss, the loss is allocated between the customer precluded and the bank asserting the preclusion according to the extent to which the failure of the customer to comply with subsection c. of this section and the failure of the bank to exercise ordinary care contributed to the loss. If the customer proves that the bank did not pay the item in good faith, the preclusion under subsection d. of this section does not apply.

f. Without regard to care or lack of care of either the customer or the bank, a customer who does not within one year after the statement or items are made available to the customer (subsection a. of this section) discover and report the customer's unauthorized signature or any alteration on the item is precluded from asserting against the bank the unauthorized signature or alteration. If there is a preclusion under this subsection, the payor bank may not recover for breach of warranty under 12A:4–208 with respect to the unauthorized signature or alteration to which the preclusion applies.

[ (Emphasis added).]

The amended statute imposes a duty on a bank customer to exercise reasonable diligence in examining statements of account. The customer must promptly notify the bank of any improper or unauthorized withdrawal. However, the customer's duty becomes operative only if the bank sends or makes available a statement of account. A bank is not under a duty to provide such a statement. But if it does not do so, "the customer does not have any duties under subsection (c)." Uniform Commercial Code Comment 1 to *N.J.S.A.* 12A:4–406. *N.J.S.A.* 12A:4–104(a) defines the word "account" to include a passbook savings account.

The question then is whether the amended *N.J.S.A.* 12A:4–406 constitutes an implied repealer and should be applied retroactively. A venerable principle of statutory construction posits that "statutes should not be given retrospective application unless such an intention is manifested by the Legislature in clear terms." *Skulski v. Nolan,* 68 *N.J.* 179, 202, 343 *A.*2d 721 (1975); *see also South Hamilton Assocs. v. Mayor & Council of Morristown,* 99 *N.J.* 437, 444, 493 *A.*2d 523 (1985); *Gibbons v. Gibbons,* 86 *N.J.* 515, 521–24, 432 *A.*2d 80 (1981); *Peper v. Princeton Univ. Bd. of Trustees,* 77 *N.J.* 55, 73, 389 *A.*2d 465 (1978); *Rothman v. Rothman,* 65 *N.J.* 219, 224–25, 320 *A.*2d 496 (1974). The purpose of this rule is to give the public fair notice of the law it is expected

to follow. *Weinstein v. Investors Sav. and Loan Ass'n,* 154 *N.J.Super.* 164, 167, 381 *A.*2d 53 (App.Div.1977), *certif. denied,* 75 *N.J.* 598, 384 *A.*2d 828 (1978); *see also* 2 Sutherland, *Statutory Construction* § 41.02 at 247 (4th ed.1973).

Despite its soundness, the principle disfavoring retrospective application of a statute "is not to be applied mechanistically to every case." *Gibbons v. Gibbons,* 86 *N.J.* at 522, 432 *A.*2d 80. Where the Legislature has explicitly or implicitly expressed an intent to make a statute retroactive, *see Kruvant v. Mayor & Council of Cedar Grove Tp.,* 82 *N.J.* 435, 440, 414 *A.*2d 9 (1980), or where the section is said to be "ameliorative" or "curative," *see In re Smigelski,* 30 *N.J.* 513, 527, 154 *A.*2d 1 (1959), or where the reasonable expectations of the parties require it, *see D.C. v. F.R.,* 286 *N.J.Super.* 589, 604, 670 *A.*2d 51 (App.Div.1996), we will apply an enactment to events that came before its effective date.

However, we are satisfied that none of these exceptions to the general rule are applicable here. The amendment provides incentives to a bank to provide its passbook customers with periodic statements of account by insulating it from liability if the depositor does not act with reasonable diligence. That incentive and the corollary duty imposed on the bank's customer did not exist at the time the withdrawals were made. It would offend the interests of justice to apply the statute retroactively in these circumstances. We thus regard *N.J.S.A.* 17:9A–227 as the controlling New Jersey law on the question of unauthorized withdrawals.

We next examine New York law on the subject. The applicable statute provides:

*Any withdrawal of moneys from any savings account or time deposit account maintained in any banking organization, branch of a foreign banking corporation, national bank, federal savings and loan association or federal credit union located in this state which is made by means of an unauthorized signature is wholly inoperative as to the person whose name is signed unless such person has authorized or ratified such withdrawal or is precluded from denying such withdrawal because he has received a portion of the funds withdrawn,* provided that in such latter event he shall be precluded from denying such withdrawal only with respect to the funds so received; provided, however, that such a signature shall operate as the signature of the unauthorized signer in favor of any such banking

organization, branch of a foreign banking corporation, national bank, federal savings and loan association or federal credit union which has, in good faith, honored such withdrawal. No such banking organization, branch of a foreign banking corporation, national bank, federal savings and loan association or federal credit union shall interpose the defense, in an action for recovery by a depositor of money paid upon an unauthorized signature, that it has exercised due care and diligence in ascertaining the identity of the person to whom it has paid such money. The term "unauthorized signature" shall have the meaning ascribed to it by section 1–201 of the uniform commercial code and the term "savings account" shall include shares issued by a savings and loan association, state or federally chartered, and by a credit union, state or federally chartered. Any waiver of the provisions of this section or any contrary agreement, bylaw, rule or regulation of any banking organization, branch of a foreign banking corporation, national bank, federal savings and loan association or federal credit union located in this state shall be void as against public policy and wholly unenforceable.

[*N.Y. Banking Law* § 676 (McKinney 1976) (emphasis added).]

This section provides "in simple and direct language, that when a bank pays out funds from a savings or time deposit account based on an unauthorized signature, it is the bank, rather than the depositor, that must bear the burden of any loss...." *American Lodge Ass'n v. East New York Sav. Bank,* 100 *A.D.*2d 281, 285, 474 *N.Y.S.*2d 332, 335 (App.Div.1984).

We thus conclude that the law of New Jersey and New York differs on the question whether the bank or its depositor incurs a loss resulting from an unauthorized withdrawal.

## III.

New Jersey has abrogated the traditional rule that the place where the contract was entered into determines the rights and obligations of the parties. *State Farm Mut. Auto. Ins. Co. v. Estate of Simmons,* 84 *N.J.* 28, 36–37, 417 *A.*2d 488 (1980). Instead, our courts have adopted a more flexible approach that focuses on the state that has the most significant connection with the parties and the transaction. *Bell v. Merchants & Businessmen's Mut. Ins. Co.,* 241 *N.J.Super.* 557, 561–62, 575 *A.*2d 878 (App.Div.), *certif. denied,* 122 *N.J.* 395, 585 *A.*2d 395 (1990); *McCabe v. Great Pac. Century Corp.,* 222 *N.J.Super.* 397, 399, 537 *A.*2d 303 (App.Div.1988), *certif. denied,* 121 *N.J.* 611, 583 *A.*2d 312 (1990). Because the law of the place of contract "generally

comport[s] with the reasonable expectations of the parties" concerning the applicable and controlling legal principles, "that forum's law should be applied 'unless the dominant and significant relationship of another state to the parties or the underlying issue dictates that this basic rule [should] yield.'" *Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n Ins. Co.*, 134 *N.J.* 96, 102, 629 *A.2d* 885 (1993) (quoting *State Farm Mut. Auto. Ins. Co. v. Estate of Simmons*, 84 *N.J.* at 37, 417 *A.2d* 488).

The approach we have taken comports with that adopted by the *Restatement (Second) of Conflicts of Laws* (1971). Section 188 of the *Restatement* provides that the law of the state having the most significant relationship to the parties and the transaction is to control. Among the factors to be considered are:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

[*Ibid.*]

These contacts are to be evaluated "according to their relative importance with respect to the particular issue." *Ibid.* However, "[i]f the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied...." *Ibid.*

Section 6 of the *Restatement* delineates the general considerations that are relevant to a court's choice of law analysis. These factors include:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

[*Ibid.*]

■ Applying these factors, we are convinced that New York had the more significant relationship with the parties and the transaction. Plaintiff and her husband were New York residents when the passbook account was created. The withdrawal agreement was executed in New York, and the parties presumably envisioned that the contractual duties would be performed in that state. NBNA, National Westminster's predecessor, was a New York bank authorized to do business only in New York. Although conflicting evidence was presented concerning the situs of the unauthorized transactions, it is undisputed that the passbook savings account was never transferred from the Brooklyn branch of the bank. Under these circumstances, it is reasonable to assume that the parties expected New York law to govern their contractual relationship.

The result we reach is also consistent with Section 195 of the *Restatement* concerning contracts for the repayment of money borrowed. That section states:

> The validity of a contract for the repayment of money lent and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that repayment be made, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.
>
> [*Ibid.*]

Comment d to Section 195, which deals specifically with the subject of bank accounts, states in pertinent part:

> *Money* lent by a bank or *deposited in a bank is usually repayable at the bank itself or, when the bank has branches, at the branch with which the customer dealt.* In the absence of an effective choice of law by the parties, the state of the applicable law in such instances *will almost invariably be the state where the bank, or the particular branch thereof, is located.*
>
> [*Ibid.* (emphasis added).]

■ We are thus satisfied that the Law Division was correct in applying New York law. We also agree with the court below that under Section 676 of New York's banking laws, National Westminster was liable for the loss resulting from Keil's unauthorized withdrawals, and that plaintiff neither consented to her husband's defalcations nor ratified his unlawful conduct. Section

676 makes specific reference to "section 1–201 of the [U]niform [C]ommercial [C]ode." *U.C.C.* 1–201(43) defines the word "[u]nauthorized" in terms of an act "made without actual, implied or apparent authority...." We, therefore, assume that Section 676 places on a depositor the loss caused by an unauthorized withdrawal where the depositor has acted in such a way as to clothe the person making the withdrawal with apparent authority.

This much conceded, the record is barren of any evidence suggesting that Richard Keil had apparent authority to withdraw funds from the custodian account. Under New York law, apparent authority of an agent may be created "by words or conduct of a principal, communicated to a third party, that gives rise to an appearance and reasonable belief ... that an agency has been created and the agent possesses the authority to enter into [the] transaction." *Hoysradt v. Nilles Ford–Mercury, Inc.*, 168 *A.D.*2d 824, 825, 563 *N.Y.S.*2d 956, 957–58 (App.Div.1990). The third party has a duty to inquire as to the scope of the agent's apparent authority where: "(1) the facts and circumstances are such as to put the third party on inquiry, (2) the transaction is extraordinary, or (3) the novelty of the transaction alerts the third party to a danger of fraud." *F.D.I.C. v. Providence College*, 115 *F.*3d 136, 141 (2d Cir.1997); *Herbert Constr. Co. v. Continental Ins. Co.*, 931 *F.*2d 989, 996 (2d Cir.1991). This duty of inquiry is "an alternative way of asking whether the third party reasonably relied on the representations of the agent that he possessed authority to bind the principal." *Herbert Constr. Co. v. Continental Ins. Co.*, 931 *F.*2d at 996.

Within this analytical framework, as a matter of law, Richard Keil was not clothed with apparent authority. The mere fact that Keil customarily prepared income tax returns on the account and prepared reports to be filed with the Veterans Administration is insufficient to establish apparent authority. We stress that under the withdrawal agreement, funds could be withdrawn "only with the written consent of the Veterans Services Officer of the Veterans Administration Regional Office ... or [his] designee." The

bank was a party to this agreement and was bound by its express terms. The withdrawal agreement should have alerted the bank to the fact that the withdrawals were unlawful. Under these circumstances, the Law Division properly held that National Westminster was responsible for the loss caused by the unauthorized withdrawal under Section 676.

## IV.

As we noted earlier, the Law Division made no determination with respect to whether plaintiff's claim was barred by the statute of limitations. Nor did the court decide whether the statute of limitations of New Jersey or New York should apply. We now consider these questions.

The initial prong of the governmental-interest analysis entails an inquiry into whether there is an actual conflict between the laws of the respective states, "a determination that is made on an issue-by-issue basis." *Gantes v. Kason Corp.*, 145 *N.J.* 478, 484, 679 *A.*2d 106 (1996). Both New Jersey and New York would apply a six year statute of limitations. *See N.J.S.A.* 2A:14–1; *N.Y. C.P.L.R.* § 213(2) (McKinney 1990). In New Jersey, the cause of action would be deemed to have accrued on the date plaintiff demanded payment and her demand was refused. *See Pagano v. United Jersey Bank*, 276 *N.J.Super.* 489, 495, 648 *A.*2d 269 (App.Div.1994), *aff'd*, 143 *N.J.* 220, 670 *A.*2d 509 (1996). In New York, however, the cause of action would be deemed to have accrued on "the date of the bank's . . . improper payment and not on the subsequent date when [the plaintiff] received knowledge of defendant's alleged breach." *Gonzalez v. Anchor Bank Corp.*, 666 *N.Y.S.*2d 151, 152 (App.Div.1997); *see also Varga v. Credit–Suisse*, 5 *A.D.*2d 289, 292, 171 *N.Y.S.*2d 674, 677 (App.Div.), *aff'd*, 5 *N.Y.*2d 865, 182 *N.Y.S.*2d 17, 155 *N.E.*2d 865 (1958); *Bollag v. National City Bank of New York*, 225 *A.D.* 218, 220, 232 *N.Y.S.* 498, 500–01 (App.Div.1929). It thus appears that the laws of New Jersey and

New York are in conflict respecting the date plaintiff's cause of action accrued.

The second prong of the governmental-interest analysis seeks to determine the interest that each state has in resolving the specific issue in dispute. That analysis requires identification of the governmental policies underlying the law of each state and how those policies are affected by each jurisdiction's contact to the litigation and the parties. *Gantes v. Kason Corp.*, 145 *N.J.* at 485, 679 *A.*2d 106 (citing *Veazey v. Doremus*, 103 *N.J.* 244, 248, 510 *A.*2d 1187 (1986)).

The purpose underlying any statute of limitations is "to 'stimulate to activity and punish negligence' and 'promote repose by giving security and stability to human affairs.'" *Id.* at 486, 679 *A.*2d 106 (quoting *Savage v. Old Bridge–Sayreville Medical Group, P.A.*, 134 *N.J.* 241, 248, 633 *A.*2d 514 (1993)). In a variety of contexts, "[t]o avoid harsh results from the mechanical application of the statute, [New Jersey] courts have developed" and applied the discovery rule, which provides that, "in an appropriate case, a cause of action will not accrue until the injured party discovers, or by exercise of reasonable diligence and intelligence should have discovered, facts which form the basis" of a claim. *O'Keeffe v. Snyder*, 83 *N.J.* 478, 491, 416 *A.*2d 862 (1980). Although not based specifically on the discovery principle, we have said, albeit in a slightly different context, that depositors "inveterately think" that "a demand and refusal are conditions precedent to the right … to sue a bank upon a deposit account, and consequently, the statute of limitations does not start to run against a depositor until a demand has been made by him." *Pagano v. United Jersey Bank*, 276 *N.J.Super.* at 496, 648 *A.*2d 269.

New York has also developed a discovery rule, but it is much more narrowly circumscribed. *See National Life Ins. Co. v. Frank B. Hall & Co. of New York*, 67 *N.Y.*2d 1021, 1023, 503

*N.Y.S.*2d 318, 319, 494 *N.E.*2d 449, 450–51 (1986). In any event, the principle that a depositor's cause of action against a bank accrues on the date of an unauthorized withdrawal and not on the subsequent date the depositor "received knowledge" is one of long standing in New York. *Gonzalez v. Anchor Bank Corp.,* 666 *N.Y.S.*2d at 152.

Our Supreme Court has "set out five requirements for barring an action by applying a statute of limitations" of a foreign state. *O'Keeffe v. Snyder,* 83 *N.J.* at 490, 416 *A.*2d 862. They are: (1) the cause of action arose in the other state; (2) the parties are all present in and amenable to jurisdiction in the other state; (3) New Jersey has no substantial interest in the matter, (4) the substantive law of the other jurisdiction is applicable, and (5) the limitations period of the other jurisdiction has expired at the time of the commencement of the suit in New Jersey. *Ibid.* (citing *Heavner v. Uniroyal, Inc.,* 63 *N.J.* 130, 140–41, 305 *A.*2d 412 (1973)). Obviously, some of these factors favor application of New Jersey's statute of limitations law and others do not. We recognize that the government-interest test is issue-specific, that is, that the focus is upon the interest each state has in resolving the particular issue in dispute. *Gantes v. Kason Corp.,* 145 *N.J.* at 484–85, 679 *A.*2d 106. We nevertheless think it would be anomalous to hold that New York's substantive law should be applied but that New Jersey's statute of limitations law also governs this dispute.

The statute in New Jersey at the time of the withdrawals, *N.J.S.A.* 17:9A–227, required the bank customer to notify the banking institution "in writing" of any unauthorized withdrawal within two years of the improper entry. The New Jersey Legislature clearly intended that the equitable principles which underlie the discovery rule were not to be applied in this situation. Indeed, under the facts of this case, New Jersey law, specifically *N.J.S.A.* 17:9A–227, would not have allowed plaintiff to recover.

We, thus, perceive no significant New Jersey policy that would provide plaintiff with access to a legal remedy in this situation. Stated somewhat differently, because the statute in effect at the time of the unauthorized withdrawals did not afford plaintiff a remedy, we see no distinct substantial New Jersey governmental interest in applying New Jersey's statute of limitations and discovery rule to afford access to New Jersey courts. Under these circumstances, application of New Jersey's limitations law would only encourage forum shopping, which would increase litigation and needlessly burden this state's courts.

We thus hold that New York's limitations law should be applied. The present record does not fully disclose when the unauthorized withdrawals occurred. Because the complaint was filed on January 29, 1996, it would appear that all wrongful withdrawals made after January 29, 1990 would be actionable. However, the exact dates of the withdrawals are not set forth in the record with particularity. As we noted earlier, the Law Division judge made no reference to questions relating to the applicability of the statute of limitations to plaintiff's claim. We thus remand the matter to the Law Division for resolution of these questions.

Accordingly, the judgment is affirmed in part and reversed in part. The matter is remanded to the Law Division for further proceedings consistent with this opinion. We do not retain jurisdiction.