**NATIONAL UTILITY SERVICE, INC., Plaintiff,**

v.

**CHESAPEAKE CORPORATION and Wisconsin Tissue Mills, Inc., Defendants.**

**Civ. No. 96–5106(WHW).**

United States District Court, D. New Jersey.

April 14, 1999.

---

Joanne S. Lehu, Kurzman, Karelesen & Frank, Englewood Cliffs, NJ, for Plaintiff.

Peter Joseph Pizzi, Connell, Foley & Geiser, Roseland, NJ, for Defendants.

WALLS, District Judge.

This matter comes before the Court on the motion of plaintiff National Utility Service, Inc. ("NUS") for summary judgment on its breach of contract claims against defendants Chesapeake Corporation ("Chesapeake") and Wisconsin Tissue Mills, Inc. ("WTM"). Pursuant to Fed. R.Civ.P. 78, the Court decides this motion without oral argument. Plaintiff NUS's motion for summary judgment is granted in part and denied in part.

## FACTS

NUS, a New Jersey corporation with its principal place of business in Park Ridge, New Jersey, is an energy and utility cost consultant. Chesapeake is a Virginia corporation which manufactures and sells tissue products, specialty packaging and displays, and forest and building products. Its principal place of business is in Richmond, Virginia. Chesapeake's subsidiary, WTM, also a manufacturer of tissue products, is a Delaware corporation with its principal place of business in Menasha, Wisconsin. This Court exercises diversity jurisdiction over this matter.

This action arises out of a July, 1988 contingent fee contract between plaintiff NUS and Chesapeake wherein Chesapeake engaged NUS to make recommendations concerning its utility and energy expenditures. Chesapeake agreed to pay NUS an initial service fee of $9,500 and after that fee had been recaptured, fifty percent of any refunds or savings realized from implementation of NUS's recommendations for a period of sixty months. (Compl.¶¶ 26–27.) Each month during the five-year term of the agreement, Chesapeake was to send NUS the electric, gas, petroleum, and water/sewer usage bills for itself, all its subsidiaries and divisions to enable NUS to make cost-saving recommendations and to determine defendants' savings as a result of plaintiff's advice. (Compl.¶¶ 34–35, 67.)

Special provisions were made for WTM in the contract, a form agreement drafted by NUS, with the exception of paragraph 11, which Chesapeake negotiated for two of its facilities. Paragraph 11 reads:

> Two of our [Chesapeake's] locations, Wisconsin Tissue Mills, Inc. and the Kraft Products facility at West Point, have substantial utility costs. Usually contracts for these utility services involve extensive negotiation and intricate agreements to determine charges for utilities furnished. It is our preference that these facilities' utility costs be audited rather than critiqued. Recommendations may be suggested, but Chesapeake is under no obligation to provide information or respond to such requests or recommendations. (Id.)

The parties understood the terms "audited" and "critiqued": an audit was an examination of the utility invoices and bills to ensure that the utility correctly calculated the bills; a critique involved an analysis of the Chesapeake facilities' usage to ensure that the facilities were utilizing the most economical rate and suggestions as to how the facilities could reduce their utility costs. (Paulette Aff. Ex. 5 ¶ 5, Ex. 6 at 29, 90, Ex. 11 at 42–43.)

After the agreement was executed, a number of Chesapeake facilities, including WTM, sent their utility bills for the previous twelve months to NUS. (Defs.' Br. In Opp. at 6.) By letter dated March 22, 1989, NUS issued its first recommendations for the Chesapeake facilities including WTM. (Id.) Some of the recommendations for WTM were forward-looking "critiques," including a recommendation that WTM improve its power factor at Plant No. 1. (Id. at 7, 9, Paulette Aff. Ex. 15 ¶¶ 9–11.) About May, 1989, Chesapeake advised NUS that these critique recommendations were outside the scope of the agreement,

that Chesapeake would not respond to them, and that NUS should not follow up on them. (Paulette Aff. Ex. 15 ¶ 11.)

In an internal NUS memorandum dated October 9, 1989, Christine R. O'Neil, an NUS account analyst described NUS's position with regard to recommendations for WTM. She wrote, "we feel that our hands are tied with regard to our success in achieving the desired result (i.e., mutual profit for our companies) due to the fact that there is a clause in our contract which limits our efforts with regard to Wisconsin Tissue Mills (Paragraph 11)." (Paulette Aff. Ex. 16.) By letter dated November 7, 1989, NUS wrote the following to Chesapeake in order to clarify the meaning of paragraph 11 of the contract:

> Specifically, this paragraph is in no way intended to preclude our company from submitting recommendations on your Wisconsin Tissue Mills, Inc. and Kraft Products facility in West Point .... your company would welcome recommendations for cost savings on these two locations with the understanding that Chesapeake Corporation has the final determination as to whether or not these recommendations will be implemented. All we request of Chesapeake Corporation is that they review the recommendations and advise us of reasons why in certain cases they may not be viable. You retain the final authorization to implement any recommendations. It is our responsibility to point out these recommendations to you along with any supporting data as to their feasibility. If you are in agreement with our clarification of paragraph 11 as contained herein, please sign one copy of this letter and return it for our files.... Once we receive this information we will reevaluate these two facilities and submit any recommendations which we have at this point in time, and/or follow through on ideas which may have been suggested in the past. (Compl.Ex. B.)

John W. Kirk, Chesapeake's Controller who had executed the original agreement,

signed and returned the letter copy on November 13, 1989.(Id.)

Chesapeake paid the initial service fee on August 4, 1988 and later paid NUS an additional $3,149 through July 8, 1992. (Compl.¶ 28.) NUS seeks recovery for four utility cost saving projects allegedly implemented by Chesapeake: (1) the power factor correction at WTM's Plant No. 1; (2) purchase of transportation gas at the Roanoke facility; (3) purchase of transportation gas at the CD & P facility; and (4) a refund and elimination of sales tax on electricity at the Holly Hill facility. (Defs.' Br. In Opp. at 14–15.) Chesapeake claims that NUS is not entitled to recover for the power factor correction at WTM because critique recommendations for WTM were specifically excluded from the contract. Moreover, Chesapeake was already in the process of improving the power factor at WTM at the time NUS made the recommendation. NUS cannot recover for the Roanoke recommendation, according to Chesapeake, because it recommended a service that did not exist at the time or for several years thereafter. Even if Chesapeake were liable for the Roanoke recommendation, its obligation to pay for the resultant savings ended when it sold the Roanoke facility on May 23, 1997. (Defs.' Br. In Opp. at 35.) Chesapeake admits liability for NUS's recommendation that CD & P purchase transportation gas but disputes the period of time for which it must pay NUS for the resultant savings. Chesapeake does not dispute its liability for the sales tax savings at the Holly Hill facility but contests Chesapeake's request for prejudgment interest.

Plaintiff contends that it made at lease sixteen separate written recommendations to Chesapeake for utility cost savings, defendants acted upon several of these recommendations, received savings and refunds as a result, but failed to pay it fifty percent of those savings and refunds. Plaintiff charges defendants with breach of contract for failure to submit their monthly utility bills to it and failure to pay it the

contracted amount, breach of the covenant of good faith and fair dealing, and unjust enrichment. Plaintiff seeks summary judgment on its breach of contract claim with regard to the WTM, Roanoke, CD & P, and Holly Hill facilities.

## DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue of fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *See Celotex v. Catrett,* 477 U.S. 317, 318, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *See Sound Ship Building Corp. v. Bethlehem Steel Co.,* 533 F.2d 96, 99 (3d Cir.1976), *cert. denied,* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976). At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. *See Wahl v. Rexnord, Inc.* 624 F.2d 1169, 1181 (3d Cir.1980).

### B. Choice of Law

#### 1. Whether Plaintiff Should Be Judicially Estopped from Arguing that Virginia Law Applies to This Case

In its summary judgment motion, plaintiff relies almost exclusively on New Jersey contract law. In its opposition papers, defendant agrees that New Jersey law applies to this case. However, plaintiff contends for the first time in its reply that Virginia's parol evidence rules should apply and that it never argued that New Jersey law applies to this case. (Pl.'s Reply at 3.) Defendants argue that plaintiff should be estopped from taking this position because it is contrary to its reliance on New Jersey law throughout the litigation. In its January 21, 1998 answers to defendants' interrogatories, plaintiff maintained that New Jersey law applied to the July, 1988 agreement, the November 7, 1989 letter from NUS to Chesapeake, and the relationship between the parties. Before plaintiff submitted its reply papers, it had relied on the contract laws of New Jersey, not Virginia. Defendants request that the Court strike that portion of plaintiff's reply brief which discusses the parol evidence rule under Virginia law.

The Third Circuit has recognized the doctrine of judicial estoppel, "a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding. It is not intended to eliminate all inconsistencies, however slight or inadvertent; rather, it is designed to prevent litigants from playing fast and loose with the courts." *In re Chambers Dev. Co.,* 148 F.3d 214, 229 (3d Cir.1998)(quoting *Ryan*

*Operations, G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996) ) (citations and internal quotations omitted). An inconsistent position alone does not trigger the doctrine,

> unless intentional self-contradiction is used as a means of obtaining unfair advantage. Thus, the doctrine of judicial estoppel does not apply when the prior position was taken because of a good faith mistake rather than as part of a scheme to mislead the court. An inconsistent argument sufficient to invoke judicial estoppel must be attributable to intentional wrongdoing.

*Chambers,* 148 F.3d at 229, (citing *Ryan,* 81 F.3d at 362). "The basic principle ... is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Fed. Prac. & Proc. § 4477 (1981 & Supp.1998). The party who seeks the estoppel need not demonstrate detrimental reliance on the previous position, and the party against whom estoppel is sought need not have benefitted from the earlier position. *Chambers,* 148 F.3d at 229; *Ryan,* 81 F.3d at 361.

There is a question as to whether state or federal judicial estoppel law applies in a diversity action. In *Chambers,* our Circuit acknowledged that New Jersey judicial estoppel law is consistent with the federal law. *Chambers,* 148 F.3d at 229 n. 13. The need for comparative analysis of state and federal judicial estoppel law is absent. Here, as in *Chambers,* because there is no relevant difference between the two rules, this Court will apply federal law.

■ The *Ryan* court developed a two part test to determine whether judicial estoppel is an appropriate remedy. First, is the position of the party against whom estoppel is sought inconsistent with a position it previously asserted in the proceedings? Second, if so, did that party assert either or both of the inconsistent positions

in bad faith-i.e., with intent to play fast and loose with the court? *Ryan,* 81 F.3d at 361. Plaintiff contends that its position that Virginia law applies is not inconsistent with any that it has previously taken in this litigation. It asserts that its interrogatory responses that New Jersey law applied were not binding admissions, and that it has never argued in a brief that New Jersey law applies. The Court finds that plaintiff's position that Virginia parol evidence rules apply is inconsistent with its earlier reliance on New Jersey contract law. Plaintiff's argument that it never contended that New Jersey law applies to this case is disingenuous. Although plaintiff never affirmatively stated that New Jersey law applies in its moving papers, it relied on New Jersey contract law without a single reference to Virginia law. Notwithstanding plaintiff's protest, its interrogatory responses are admissions.

■ As to the second part of the test, whether either or both of the inconsistent positions were asserted in bad faith, plaintiff claims that it had not argued that Virginia law applies earlier because it had not fully researched the choice of law issue until preparation of its motion for summary judgment. Although this may be true, it does not explain why NUS did not assert that Virginia parol evidence rules apply in its moving papers when defendants would have had an opportunity to respond to the assertion. Plaintiff's explanation is suspect, but it does not demonstrate bad faith or an intent to play fast and loose with the Court. Because the Court has not found evidence that plaintiff took the position in bad faith that Virginia law applies, plaintiff is not judicially estopped from adopting that stance. Because plaintiff first adopted this position in its reply brief, defendants did not have an opportunity to respond to it. In the interests of justice to remedy this circumstance, the Court has given leave to defendants to file a sur-reply with regard to the choice of law issue. As plaintiff raised the issue in its reply brief and has already had an

opportunity to brief the issue, its application to file an additional brief is denied.

### 2. Whether a True Conflict Exists Between the Parol Evidence Law of New Jersey and Virginia

 Plaintiff contends that Virginia's parol evidence rules should apply to this case and defendants counter that those of New Jersey are applicable. Plaintiff argues that there is no significant difference between the laws of the two states, but defendants insist that there is. Because there is a choice of law issue only if the laws of those two states differ, the Court must first determine whether there is a conflict between the parol evidence rules of New Jersey and Virginia. *Oil Shipping B.V. v. Sonmez Denizcilik Ve Ticaret A.S.,* 10 F.3d 1015, 1018 (3d Cir.1993).

 Under New Jersey law, extrinsic evidence is admissible to aid in the interpretation of an agreement even where the agreement is unambiguous on its face. *Atlantic Northern Airlines v. Schwimmer,* 12 N.J. 293, 301, 96 A.2d 652, 656 (1953)("Evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity."). The intention of the parties is the guiding principle of the contract's construction, "and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded." *Atlantic Northern Airlines,* 12 N.J. at 301, 96 A.2d at 656. Even when a contract is facially unambiguous, it may be susceptible to more than one meaning and ambiguous "when understood from the 'linguistic reference point of the parties.'" *Sumitomo Machinery Corp. of America v. AlliedSignal, Inc.,* 81 F.3d 328, 332 (3d Cir.1996)(quoting *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1011 (3d Cir.1980)). The extrinsic evidence may reveal an ambiguity that was not evident from the face of the contract because it may demonstrate that from the linguistic reference point of the partes, the contract is susceptible of different meanings. *See, e.g., American Cyanamid Co. v. Fermenta Animal Health Co.,* 54 F.3d 177, 181 (3d Cir.1995).

 By contrast, under Virginia law, for extrinsic evidence to be admissible to aid in the interpretation of a contract, "the ambiguity must be apparent on the face of the instrument." *Cohan v. Thurston,* 223 Va. 523, 525, 292 S.E.2d 45, 46 (1982). As the Virginia Supreme Court announced in *Berry v. Klinger,* 225 Va. 201, 300 S.E.2d 792 (1983), "[w]e adhere to the 'plain meaning' rule in Virginia: '[W]here an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself.'" 225 Va. at 208, 300 S.E.2d at 796 (quoting *Globe Iron Const. Co. v. First Bank of Boston,* 205 Va. 841, 848, 140 S.E.2d 629, 633 (1965)). Because extrinsic evidence is admissible to aid in the interpretation of an agreement that is free from ambiguity on its face under New Jersey law but not under Virginia law, the parol evidence laws of these two states are in conflict.

### 3. Whether New Jersey or Virginia Parol Evidence Rules Apply

 A federal court with diversity jurisdiction must apply the choice of law principles of the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–1022, 85 L.Ed. 1477 (1941). Under New Jersey law, the governing law in a contract case is that of the jurisdiction with the most significant relationship and closest contacts with the transaction and the parties. *Keil v. National Westminster Bank,* 710 A.2d 563, 569, 311 N.J.Super. 473, 485 (App.Div. 1998); *State Farm Mut. Auto. Ins. Co. v. Estate of Simmons,* 84 N.J. 28, 35–37, 417 A.2d 488, 491–492 (1980). To determine which state has more significant contacts with the parties and the contract, New

Jersey courts look to the following non-exclusive contacts listed in § 188 of the Restatement (Second) of Conflict of Laws:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

Restatement (Second) of Conflict of Laws § 188(2) (1969); *see, e.g., Keil,* 311 N.J.Super. at 485, 710 A.2d at 569–570. In addition, courts consider the factors relevant to the applicable rule of law in § 6 of the Restatement:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6 (1969); *see General Ceramics Inc. v. Firemen's Fund Insurance Cos.,* 66 F.3d 647, 653 (3d Cir.1995). There is a presumption that the law of the place of contracting should apply to the interpretation of the contract. "Because the law of the place of contract 'generally comport[s] with the reasonable expectations of the parties' concerning the applicable and controlling legal principles, 'that forum's law should be applied unless the dominant and significant relationship of another state to the parties or the underlying issue dictates that this basic rule [should] yield.'" *Keil,*

311 N.J.Super. at 484, 710 A.2d at 569 (quoting *Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n Ins. Co.,* 134 N.J. 96, 102, 629 A.2d 885 (1993)).

■ Upon consideration of these factors, the Court finds that New Jersey has a more significant relationship to the parties and the contract than Virginia. The place of contracting was New Jersey. NUS initially solicited Chesapeake with mailings and telephone calls from New Jersey and the parties negotiated the agreement both in New Jersey and Virginia. The agreement is a slightly modified version of NUS's form contract, developed in New Jersey, although modifications were drafted in Virginia. Chesapeake prepared an offer based on NUS's standard form contract and sent it to NUS in New Jersey. In New Jersey, NUS accepted the offer and thereby formed the contract. The agreement was performed in New Jersey, Virginia, and several other states. Here, in New Jersey, NUS received utility bills from Chesapeake's facilities, analyzed those bills, and issued correspondence concerning the utility expenditures. Although Chesapeake incurred utility expenses and allegedly implemented NUS's recommendations in Virginia, its facilities also did the same in Maryland, Pennsylvania, South Carolina, Kentucky, Wisconsin, and North Carolina. The places of incorporation and principal places of business of the parties do not give Virginia a more significant relationship to the transaction or the parties than New Jersey. Plaintiff NUS is incorporated and has its principal place of business in New Jersey; defendant Chesapeake is incorporated and has its principal place of business in Virginia; and defendant WTM is a Delaware corporation with its principal place of business in Wisconsin. Because New Jersey was the place of contracting and Virginia's relationship to the parties and the contract does not dominate over that of New Jersey, the contract law, including the parol evidence rules, of New Jersey apply.

## C. Breach of Contract

■ To succeed on the motion for summary judgment on its breach of contract claim, NUS must prove that it had a valid and binding contractual relationship with Chesapeake and WTM, that it complied with and performed its obligations under the contract, that Chesapeake and WTM breached the contract, and NUS suffered damages as a consequence. *See, e.g.,* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1235 at 269–271 (1990). Neither party disputes that the July, 1988 agreement is a valid and binding contract. NUS maintains that it fulfilled its obligations under the contract through its submission of recommendations to Chesapeake about utilities cost savings at Chesapeake's various facilities. Although Chesapeake argues that NUS's "critique" recommendations for WTM were outside the scope of the agreement, it does not contend that NUS breached the contract with these recommendations. At issue is whether Chesapeake and WTM acted upon and implemented NUS's recommendations, saved costs on their utilities thereby, and refused to pay NUS its share of these savings in violation of the contract.

### 1. WTM Facility

### a. Paragraph 11 of the Agreement

It is undisputed that defendants undertook a power factor correction project at WTM from which they received utilities cost savings. The parties dispute whether the agreement allowed NUS to make "critique" recommendations for WTM about its power factor, and if so, what obligations each had to such recommendations. Whether WTM acted upon these recommendations is disputed by the parties.

Plaintiff contends that defendants initiated the power factor correction project after and because of its recommendation that they improve the power factor at WTM Plant No. 1. Plaintiff maintains that the July, 1988 contract authorized it to make "critique" recommendations for WTM and obliged Chesapeake and WTM to pay it fifty percent of any savings received if they acted upon and implemented those recommendations. Plaintiff asserts that the November 7, 1989 letter was a mere clarification of the contract, and as such, provides the definitive interpretation of paragraph 11 from the moment the contract was executed in July, 1988.

Defendants declare that under the plain language of paragraph 11 of the contract, NUS could provide only audits, not "critique" recommendations for WTM. Defendants insist that the November 7, 1989 letter was not a clarification but an actual change of the contract which was effective prospectively, but not retrospectively. To support their position, defendants aver that some terms of the November 7, 1989 "clarification" are clearly inconsistent with paragraph 11 of the original agreement: For example, if NUS provided Chesapeake with audits for WTM, under paragraph 11 Chesapeake was "under no obligation to provide information or respond to such requests or recommendations." (Compl. Ex. A ¶ 11.) However, the November, 1989 letter required Chesapeake to "review the recommendations and advise [NUS] of reasons why in certain cases they may not be viable." (Compl.Ex. B.) Defendants maintain that inconsistencies such as this lead to the conclusion that the November, 1989 letter modified, not clarified, the terms of the July, 1988 agreement.

■ To resolve the parties' dispute over the WTM recommendations, the Court must first determine whether the contract is ambiguous with regard to WTM. *Sumitomo Machinery Corp. of America v. AlliedSignal, Inc.,* 81 F.3d 328, 332 (3d Cir.1996)(citing *Teamsters Indus. Emp. Welfare Fund v. Rolls–Royce,* 989 F.2d 132, 135 (3d Cir.1993) ). A contract is ambiguous if it "is susceptible of more than one meaning." *Sumitomo,* 81 F.3d at 332 (quoting *Briggs v. United Shoe Machinery Corp.,* 92 N.J. Eq. 277, 287, 114 A.

538, 542 (Err. & App.), *cert. denied,* 254 U.S. 653, 41 S.Ct. 149, 65 L.Ed. 459 (1920)). As stated, although a contract may be unambiguous on its face, it may be susceptible to more than one meaning "when understood from the 'linguistic reference point of the parties.'" *Sumitomo,* 81 F.3d at 332 (quoting *Mellon Bank,* 619 F.2d at 1011).

◼ The Court finds that paragraph 11 of the original agreement is susceptible to more than one meaning and is ambiguous. In particular, the last two sentences of the paragraph are open to a variety of interpretations. "It is our preference that [WTM and the Kraft Products facility] be audited rather than critiqued" may express a preference for audits but not a prohibition of critiques. On the other hand, it may be, as defendants argue, a polite or euphemistic prohibition of critiques and an invitation for audits. Although evidence that Chesapeake would not have signed the contract had critique recommendations for WTM not been banned is indicative of Chesapeake's intent, it does not demonstrate that NUS agreed to such a ban. Similarly, NUS's admission that paragraph 11 limited its efforts with regard to WTM does not belie NUS's argument that the contract did not prohibit critique recommendations. The November 7, 1989 "clarification" muddies the meaning of the contract further. Chesapeake's obligations in the "clarification" are inconsistent with its original ones in paragraph 11. Such a reading supports Chesapeake's position that the clarification modified, not clarified, paragraph 11, but does not betray the parties' original understanding of paragraph 11. Because the meaning of paragraph 11 is ambiguous, it is similarly unclear to what extent the "clarification" modified, rather than clarified, that paragraph. The November "clarification's" assertion that paragraph 11 "is in no way intended to preclude [NUS] from submitting recommendations" with regard to WTM is a plausible interpretation of paragraph 11. Issues of material fact preclude a determination of whether the November, 1989 letter was a clarification, a modification, or a hybrid of the two, and whether the letter applied retrospectively or prospectively.

**b. Whether Defendants Acted upon or Implemented a NUS Recommendation at WTM**

◼ Under the contract, Chesapeake was not obliged to pay NUS for its services unless it acted upon and implemented a NUS recommendation. (Compl. Ex. A ¶ 3.) Chesapeake argues that even if the contract permitted NUS to make critique recommendations about WTM, it still did not breach the contract because it did not "act upon" or "implement" any NUS recommendation. Chesapeake contends that WTM's decision-makers were unaware of NUS's recommendation, and that WTM already knew of the potential cost savings of a power factor improvement and had begun the improvement incrementally before the contract was executed. Finally, Chesapeake states that the impetus for WTM's power factor project was a warning that its electric utility might not have been able to provide reliable power without improvement to the power factor.

NUS responds that as soon as it gave Chesapeake the WTM recommendation, the WTM decision-makers were deemed to have knowledge of it. NUS also argues that defendants' earlier knowledge of the power factor correction, if any, is irrelevant because the agreement does not exclude prior knowledge. Similarly, NUS maintains that the electric utility warning is also irrelevant because its recommendation was pending at the time WTM undertook the power factor improvement project.

The Court finds that there is no merit to Chesapeake's argument that it did not act upon NUS's recommendation because Bernie Kopp, the person who decided to invest in the power factor project, was unaware of the recommendation. That the individual who made the ultimate decision to in-

vest did not know of the recommendation is of no consequence. S. Bruce Saunders, the staff assistant to Chesapeake's Controller, was aware of the recommendation and he relayed it to David Juedes, WTM's accountant. Because management individuals at both Chesapeake and WTM had knowledge of the recommendation, Kopp's ignorance of it is immaterial.

The meaning of the terms "acted upon" and "implemented" will form the determination of whether defendants' prior knowledge, if any, of the need for a power factor improvement has any effect on defendants' liability for the WTM recommendation. If, as defendants argue, "acted upon" and "implemented" mean a causal relationship between the recommendation and the cost-saving action, then defendants' earlier knowledge of the power factor problem is relevant to their liability. Defendants contend that before the parties executed the contract, John W. Kirk, Chesapeake's Controller, wrote an interoffice memorandum to confirm his understanding that "NUS does not benefit from improvements we implement on our own." (Defs.' Br. In Opp. at 3, Paulette Affidavit Ex. 5 at Ex. B.) Defendants argue that an August 21, 1992 letter from NUS which stated that it was entitled to compensation because its recommendation was the "impetus" for WTM's power factor correction project constitutes an admission that NUS is not entitled to compensation unless its recommendation served as an impetus. (Defs.' Br. In Opp. at 29; Paulette Aff. Ex. 31.) However, if an action upon and implementation of a recommendation may include any act consistent with a recommendation after made, then defendants' prior knowledge is irrelevant. As said, evidence of the circumstances of the parties and their negotiations is admissible to aid the interpretation of an agreement.

The Court finds that the terms "acted upon" and "implemented" are susceptible to more than one meaning. The contract does not define the terms; evidence of Kirks' understanding of the contract has failed to elucidate them. "Improvements we implement on our own" could refer to improvements which are completely unrelated to NUS's recommendations, to those which Chesapeake implemented notwithstanding NUS's recommendations, or those which Chesapeake thought of independently and which NUS recommended. Moreover, Kirk's memorandum was not circulated or agreed to by NUS; it represents Kirk's understanding of the arrangement, not the mutual understanding of NUS and Chesapeake. Finally, in addition to its flaws in reasoning, defendants' argument about NUS's post-contractual interpretation is unavailing because it provides no insight into the parties' understanding of the contract at the time of execution. The terms "acted upon" and "implemented" are ambiguous, and the Court cannot determine whether a prior understanding of WTM's power factor problem by defendants affects its liability for NUS's recommendation. Issues of material fact preclude the determination whether defendants acted upon and implemented NUS's recommendation for WTM to their liability.

### c. NUS's Damages

■■■ Chesapeake argues that even if it is liable to NUS for the WTM recommendation, NUS has overstated its claim because it ignored WTM's capital costs in the power factor correction project. Chesapeake contends that "savings" secured as the result of a recommendation cannot be interpreted reasonably to exclude the capital expenditures necessary to realize those savings. NUS rejoins that the agreement refers only to savings on utility bills and that capital expenditures are irrelevant.

Under the agreement, Chesapeake agreed to pay NUS "fifty (50%) percent of each savings secured," but the term "savings" is not defined. Although Chesapeake's argument is compelling, reasonableness is a question to be decided by the jury.

## 2. Roanoke Facility

In March, 1989, NUS recommended that the Roanoke facility purchase "transportation gas" from its gas utility-that it purchase natural gas from a third party and purchase the transportation of the gas from the Roanoke Gas Company. Chesapeake argues that it did not act upon or implement this recommendation because implementation was impossible at the time it was advanced. Chesapeake contends that because the agreement only authorized NUS to submit recommendations on "possible savings" (Compl. Ex.A ¶ 1), any recommendation for savings that were not possible at the time was unauthorized. (Defs. Br. In Opp. at 33.) The Roanoke Gas Company did not offer a transportation rate in 1989.(Id.) According to Chesapeake, Roanoke's gas utility began to offer a transportation rate in August, 1992. (Id.; Paulette Aff. Ex. 42 ¶ 8.) Chesapeake's Roanoke facility switched to transportation gas in November, 1995. (Defs.' Br. In Opp. at 33; Paulette Aff. Ex. 42 ¶ 10.) Chesapeake argues that because the Roanoke facility did not switch to transportation gas until more than six years after NUS made its recommendation and more than two years after the five-year agreement had expired, it is not liable to NUS for the recommendation. (Defs.' Br. In Opp. at 33.) The recommendation must expire within a commercially reasonable time, and Chesapeake contends that what constitutes a "reasonable time" is a question of fact to be determined by the jury. Finally, Chesapeake asserts that it sold the Roanoke facility on May 23, 1997, and even if it is found liable for the transportation gas recommendation, it is not obliged to pay Chesapeake for any savings after the date of sale. (Paulette Aff., Ex. 45.)

NUS declares that its recommendation for the Roanoke facility was not impossible to implement at the time made. NUS claims that with its advice and guidance, the Roanoke facility could have negotiated with the Roanoke Gas Company to make the transportation rate available at an earlier date. (Pl.'s Reply at 13; O'Neil Reply Aff. ¶¶ 26–27.) According to NUS, the transportation service was unavailable because Chesapeake failed to negotiate with the Roanoke Gas Company for it. NUS maintains that "[f]or Roanoke, under certain circumstances, transportation gas savings were 'possible,' even though the utility company did not previously publish a tariff for transportation service, because, by following NUS's advice and continued guidance, Roanoke may have obtained a transportation service years earlier than it did." (Frankel Reply Aff. ¶ 25.) Moreover, NUS contends that its recommendation was still pending when the Roanoke facility began to purchase transportation gas. NUS claims that the recommendation was "alive" from the time it was made to the time it was implemented because NUS followed it up during that period. However, the evidence that NUS has presented demonstrates that the last such follow-up was on August 20, 1990, more than five years before the Roanoke facility switched to transportation gas. (Brown Aff. Exs. 25–29.) NUS does not dispute that it is not entitled to share in savings after the Roanoke facility was sold, but it argues that "Chesapeake has shown no admissible evidence to prove if and when Roanoke was sold." (Pl.'s Reply at 14 n. 38.)

There is a material issue of fact as to whether NUS's recommendation was still pending when the Roanoke facility switched to transportation gas. Whether the recommended action was possible at the time the recommendation was made is a question to be answered by the fact finder. The Court cannot determine now if Chesapeake sold the Roanoke facility on March 23, 1997. In support of this averment, Chesapeake has offered the sworn affidavit of William T. Tolley, its Chief Financial Officer. NUS argues that this evidence is inadmissible. The Court finds that Mr. Tolley's affidavit is self-serving and does not establish, by itself, that the Roanoke facility was sold on March 23,

1997. The resolution of these material issues will be at trial.

### 3. CD&P Facility

 Chesapeake admits that it implemented NUS's recommendation that CD & P purchase transportation gas, and admits liability for that recommendation. However, Chesapeake disputes the period for which it must pay NUS a portion of savings attributable to the recommendation. Chesapeake's savings from the CD & P recommendation were still occurring in July, 1993, at the expiration of the agreement. Chesapeake realized its initial savings from the CD & P recommendation in September, 1989, and agreed to pay NUS through September, 1994. Chesapeake argues that it is obliged to pay NUS for savings received as a result of the CD & P recommendation for a period of sixty months which began with CD & P's initial savings. According to Chesapeake's calculation, this sixty month period includes the months during which it recaptured its initial service fee. NUS, however, maintains that the sixty month period did not commence until Chesapeake had recaptured its initial service fee.

There are two paragraphs in the agreement which are relevant to this dispute. The first, paragraph 5(b) promises:

> After recapture of our service fee, we will pay you fifty (50%) percent of each refund secured during the term of this agreement. We shall also pay you fifty (50%) percent of each savings secured for a period of sixty (60) months after which the entire savings will be ours.

The first sentence of this paragraph simply provides that Chesapeake will pay fifty percent of its savings after its service fee has been recaptured. The second sentence requires Chesapeake to pay fifty percent of its savings for a period of sixty months. Read together, these two sentences signify that the sixty months begins after the service fee is recaptured when Chesapeake begins its fifty percent pay-

ments. However, paragraph 7 of the agreement provides:

> In the event that a savings is in effect at the expiration of this agreement, then we will continue to send you information and our invoices covering the locations where savings are in effect until the sixty (60) month period from the initial savings has expired. During this time frame, we will pay you as outlined above.

Under this paragraph the sixty month period starts when the initial savings have been realized. This statement could mean that the sixty month period begins when Chesapeake first receives the savings from a recommendation, notwithstanding the recapture of the service fee. However, "the initial savings" could also refer to savings realized by Chesapeake after its service fee was recaptured. The parties' dispute as to when the sixty month period began is material, another question of fact to be determined at trial.

### 4. Holly Hill Facility

 On March 22, 1989, NUS recommended that Chesapeake seek the elimination of a sales tax on electricity at the Holly Hill facility with a corresponding refund. Chesapeake agrees that it sought, received the refund and elimination of the tax, and is liable to NUS for fifty percent of its savings. NUS claims its share of the savings, $5,384.27, and prejudgment interest in the amount of $3,201.96, a total of $8,586.23. Chesapeake admits that it owes NUS $5,384.27, but it denies the demand for prejudgment interest.

By paragraph 5(c) of the agreement, Chesapeake agreed to pay NUS upon NUS's receipt of an invoice showing computation of savings and/or refunds, and under paragraphs 2 and 7, Chesapeake agreed to send monthly invoices to NUS. Chesapeake realized its first savings, the tax refund, on July 11, 1991, and continued to reap the savings from the tax elimination each month thereafter. It has failed to pay NUS for any of these savings.

NUS has calculated its prejudgment interest at a rate of 0.02466% per day or 8.78% annually from the date that each payment was due. NUS was denied payment through no fault of its own, but by Chesapeake's breach of contract. Accordingly, NUS is entitled to prejudgment interest in the amount of $3,201.96 together with $5,384.27, past due savings, for a total of $8,586.23.

## CONCLUSION

NUS's motion for summary judgment is denied with regard to the WTM, Roanoke, and CD & P facilities, and granted with regard to the Holly Hill facility.

## ORDER

This matter comes before the Court on the motion of plaintiff National Utility Service, Inc. ("NUS") for summary judgment on its claims against defendants Chesapeake Corporation ("Chesapeake") and Wisconsin Tissue Mills, Inc. ("Wisconsin"). Upon consideration of the submissions of the parties and for the reasons stated in the accompanying opinion,

It is on this day of April, 1999:

ORDERED that plaintiff NUS's motion for summary judgment on its claims against Chesapeake is granted with regard to the Holly Hill facility;

ORDERED that plaintiff NUS's motion for summary judgment on its claims against Chesapeake and Wisconsin is denied with regard to the WTM, Roanoke, and CD & P facilities.