NATIONAL UTILITY SERVICE, INC., Plaintiff,

v.

HUNTSMAN CHEMICAL CORPORA-TION and Huntsman Polypropylene Corporation, Defendants.

No. 97–CIV–455 (WGB).

United States District Court, D. New Jersey.

Nov. 12, 1999.

Michael P. Graff, Kurzman Karelsen & Frank, LLP, New York City, for plaintiff.

Peter J. Pizzi, Tricia B. O'Reilly, Connell, Foley & Geiser, LLP, Roseland, N.J., for defendants.

## OPINION

BASSLER, District Judge.

Plaintiff National Utility Service, Inc. ("NUS") moves *in limine* to exclude Defendants Huntsman Chemical Corporation and Huntsman Polypropylene Corporation (collectively "Huntsman") from introducing certain evidence.[1]

For the reasons discussed below, the Court **grants in part and denies in part** Plaintiff NUS' motion *in limine*.

## I. BACKGROUND

### A. The Agreement

NUS is an energy and utility cost consultant. In January, 1991, NUS entered into a written agreement ("Agreement") with Huntsman. Under the terms of the Agreement, NUS was to analyze Huntsman's energy use and its energy and utility bills and then make recommendations to assist Huntsman "in obtaining refunds and

1. The Court has jurisdiction over this action pursuant to 28 U.S.C. Section 1332.

savings in energy supplies and utility services." (Compl.¶ 12.)

The Agreement provides, in pertinent part:

"1. We hereby authorize you to submit recommendations for· savings and refunds on our costs of electricity, gas, ... water.... You will analyze our costs and advise where refunds and reductions can be obtained.

2. Your continuing analysis will cover our current bills, which we will send to you each month during the term of this agreement.

3. Any recommendation you make is subject to our approval. *Any recommendation acted upon by us shall be deemed accepted and if implemented,* we will pay you...."

(emphasis added.)

In exchange for its services, Huntsman was to pay NUS an initial service fee of $12,000.00. Furthermore, Huntsman agreed to pay 50 percent of all savings realized from implementing recommendations of NUS for a period of 60 months. Payments by Huntsman to NUS were due "after such savings and refunds [were] achieved [by Huntsman]," (Agreement ¶ 3), and after Huntsman recaptured the initial service fee, (*id.* ¶ 5).

### B. *Recommendations for Savings*

When NUS and Hunstman entered into their contract, Hunstman and Unit Gas Transmission Company ("Unit Gas")[2] were parties to a five-year requirements contract dated July 1, 1989 ("Unit Gas Contract"). The Unit Gas Contract obligated Unit to supply up to 23,000 Mcf/day and Huntsman to buy, not a daily fixed amount, but all of its fuel requirements for its plant.

According to NUS, it recommended to Huntsman in June and August 1992 that Huntsman should renegotiate its contract with Unit Gas to reduce or eliminate a

---

2. Unit Gas later changed its name to Entex.

certain 5 cent mark-up that Huntsman was paying. NUS suggested that a "credible threat of bypass would create the proper leverage with Unit Gas in order to effect reductions in the present [Unit Gas] contract ..." (Exhibit 61 attached to NUS' Brief in Support of Motion *In Limine.*)

According to Huntsman, a credible threat of bypass was nothing more than a recommendation to construct an entirely separate gas pipeline into the plant and contract with a supplier other than Unit Gas. A potential vendor identified by NUS was USA Gas. Hunstman contends that NUS went so far as to suggest that Huntsman cancel its contract with Unit Gas/Entex. After meeting with a USA Gas representative, which was arranged by NUS, Huntsman rejected USA Gas' proposal. It also refused to threaten to repudiate the Unit Gas Contract.

In November 1992, Huntsman allegedly began negotiating a new contract with Entex. Then, in November 1993, Huntsman and Entex entered into a renegotiated contract that supplanted the Unit Gas Contract. The renegotiated contract eliminated gradually the 5 cent mark-up in exchange for an extended term. NUS claims, therefore, that Huntsman implemented the recommendation of NUS and that Huntsman owed NUS fifty percent of the savings achieved by this renegotiation.

On January 28, 1997, NUS filed a Complaint against Huntsman seeking its half of the savings achieved by this and other recommendations of NUS that were allegedly implemented by Huntsman.

## II. *DISCUSSION*

### A. *Motion I—Extrinsic Evidence Regarding Meaning of Contract*

Plaintiff NUS objects to the introduction of pre-contractual statements and documents regarding the "intent of the parties" at the time the parties entered into the Agreement. Accordingly, it seeks to ex-

clude the testimony of four of Huntsman's witness: Peter Huntsman, Lisa Lynn Anderson, Richard Rozman, and part of the testimony of Brian Ridd. Plaintiff also seeks to exclude Huntsman Exhibits 5–8, 13, 15, 17, 204–208, 210–216, and 220 a–o. NUS asserts that the parties' intent should be gleaned only from the writing itself and that parol evidence is not admissible because the Agreement is a fully integrated document, the terms of which are clear and unambiguous.

According to NUS, the Agreement provides that after gas, water and electric bills were forwarded to NUS for analysis, if NUS submitted an idea that Huntsman had not implemented, and that idea was thereafter acted upon and implemented, NUS would be paid its share of the savings. Under NUS' interpretation of the plain language of the Agreement, NUS' recommendation need not "cause" the achieved savings. In other words, NUS claims it is entitled to share in savings regardless of whether or not the savings are directly attributable to NUS' recommendation. That is, under the Agreement, Huntsman cannot refuse to share its savings on the basis that its own prior knowledge of a particular recommendation, rather than NUS' recommendation, was what "caused" the savings. NUS contends that Huntsman received what it bargained for and that any prior knowledge of NUS' recommendations is therefore immaterial under the Agreement. NUS notes that the Agreement, as written, includes sharing in Huntsman's savings when Huntsman was merely aware of but failed to act upon the same idea before NUS' recommendation. Finally, it also suggests that if Huntsman wanted to exclude from the Agreement actions that Huntsman previously knew about or independently learned of, Huntsman could have specifically done so by amendment to the Agreement. NUS argues that parol evidence should therefore, not be permitted to extend, change, or "detract from" the scope of the Agreement.

Huntsman disagrees that it is seeking to alter or "detract from" the scope of the Agreement in any way. Rather, it asserts that parol evidence is admissible to show the intent of the parties regarding the true meaning of the terms of the Agreement. Specifically, Huntsman claims that in paragraph three of the Agreement, "acted upon" and "implemented" are "reasonably susceptible" of a different interpretation, namely, that when a customer had "prior knowledge" of a recommendation made by NUS, NUS is precluded from recovery. It is Hunstman's contention that under the Agreement, NUS must have caused the savings in order to be entitled to any recovery. As an example, Huntsman points to the NUS brochure that states, "NATIONAL UTILITY SERVICE DOES NOT SHARE IN SAVINGS WHICH CLIENTS OBTAIN FOR THEM-SELVES." Huntsman insists that the evidence sought to be excluded by NUS is entirely consistent with Huntsman's interpretation. As evidence that Huntsman had prior knowledge of the idea to renegotiate the Unit Gas contract, Huntsman relies on an internal memo dated April 1, 1992. That memo provides:

It may be appropriate to consider renegotiation of the contract at an even lower rate. In talking to Bill Cable, he indicated that Entex might be willing to accept a lower rate when we renew the contract. My thought is that *they might be interested in renegotiating the contract now, at a lower rate in exchange for an extended term, similar to the negotiations with Shell. A reduction of $.05/MMBTU could save the company $300,000 to $400,000 per year.*

(emphasis added.) NUS claims that during an NUS employee's visit to the Huntsman plant in Texas on June 23, 1992, three Huntsman employees revealed to NUS Huntsman's strategies for reducing utility costs, including the idea to obtain savings by renegotiating the Unit Gas contract. Then on August 31, 1992, NUS wrote Huntsman a letter in which it allegedly

parroted the precise verbiage of the April 1, 1992 internal memo in suggesting that "$300,000 to $400,000 per year" could be saved through better pricing from Unit Gas. *See also* NUS Ex. 54 attached to Plaintiff's Motion *In Limine.*

■ The parties agree that California law applies. *See* Final Pretrial Order. The Parol Evidence Rule, set forth in § 1856 of the California Code of Civil Procedure, provides in pertinent part:

(a) [t]erms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement.

(b) [t]he terms set forth in a writing described in subdivision (a) may be explained or supplemented by evidence of consistent additional terms unless the writing is intended also as a complete and exclusive statement of the terms of the agreement.

. . .

(g) [t]his section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in Section 1860, or to explain an extrinsic ambiguity or otherwise interpret the terms of the agreement, . . . .

If the terms of an agreement contain an ambiguity, then extrinsic evidence offered to interpret or explain the meaning of the terms of a written agreement is admissible "regardless whether the writing is intended by the parties as a final, complete, and exclusive statement of those terms." Ca. Civ.P., Law Revision Commission Comment 1978 Amendment; *see* Ca.Civ.P., § 1856(g); *see also Hayter Trucking, Inc. v. Shell Western E&P, Inc.,* 18 Cal.App.4th 1, 22 Cal.Rptr.2d 229 (5th Dist.1993). Evidence offered to interpret or explain the

meaning of the terms of a written agreement is subject to the normal rules of admissibility and construction of instruments, including the rule that:

"[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. (Citations omitted) . . .

Although extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written contract, these terms must first be determined before it can be decided whether or not extrinsic evidence is being offered for a prohibited purpose. *The fact that the terms of an instrument appear clear to a judge does not preclude the possibility that the parties chose the language of the instrument to express different terms.*"

Ca.Civ.P., Law Revision Commission Comment 1978 Amendment (citing *Pacific Gas & E. Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 40, 69 Cal.Rptr. 561, 442 P.2d 641 (1968) (emphasis added)); *see also Sunniland Fruit, Inc. v. Verni,* 233 Cal.App.3d 892, 898, 284 Cal. Rptr. 824, 827 (1991).

■ It is clear that under California law, this Court's determination of whether the language of the Agreement appears clear or ambiguous is not dispositive of Plaintiff's motion.[3] Rather, this Court must decide whether Defendant's offered evidence is relevant to prove a meaning to which certain terms of the Agreement, specifically "acted upon" and "implemented," are reasonably susceptible.

NUS relies on various court decisions that hold that the language used in NUS' form letter Agreements was clear and un-

---

3. California law was not applied in *Savannah,* CV-91-2891 (WGB), slip op., *Freedom Forge Corp.,* CV-94-0659, slip op., or in *J.R. Sexton, Inc.,* 1989 WL 343048.

It is unclear what law was being applied in *Callahan Mining Corp.,* 799 F.Supp. 1004 because no law was cited by the court.

ambiguous. *National Utility Service, Inc. v. Savannah Foods & Industries, Inc.,* CV–91–2891 (WGB), slip op. at 19 (D.N.J. Sept. 9, 1994) (finding language identical to that in paragraph 3 to be "facially simple and unambiguous"), *aff'd in part, vacated in part* 61 F.3d 895 (3d Cir.1995)[4]; *National Utility Service, Inc. v. Freedom Forge Corp.,* CV–94–0659, slip op., at 9–10 (M.D.Pa. Jan. 16, 1996) (finding to be straightforward and unambiguous language identical to paragraph 3 in this case); *National Utility Service, Inc. v. J.R. Sexton, Inc.,* 1989 WL 343048 (D.Conn. Nov.3, 1989) (interpreting contract that provided "[a]ny [NUS] recommendation acted on by [Sexton] shall be deemed accepted.... [Sexton] will pay [NUS] only for savings which actually become effective on [Sexton's] bills after [NUS'] recommendation is implemented").

Courts have also held that NUS' recommendation need not have been the direct cause of the savings. *See National Utility Service, Inc. v. Callahan Mining Corp.,* 799 F.Supp. 1004, 1005–06 (N.D.Cal.1990). In *Callahan Mining Corp.,* the court, considering a NUS contract with a paragraph 3 identical to the one here, rejected defendant's contention that "the contract should be read to require proof of a causal relationship between NUS' advice and the savings achieved before NUS is entitled to a percentage of the savings." *See also Savannah,* CV–91–2891 at 14 ("after [Savannah] entered into the Agreement with NUS ... Savannah worked independent of NUS at its own risk"); *Sexton,* 1989 WL 343048, at *2 ("[t]he contract nowhere suggests or envisages an inquiry into the state of mind of Sexton or its officials to determine the degree to which they were influenced by factors other than the N.U.S. report to adopt the course of action recommended by N.U.S.")

Huntsman relies on *National Utility Service, Inc. v. Chesapeake Corp.,* 45 F.Supp.2d 438, 450 (D.N.J.1999). In that case, Judge Walls denied NUS' motion for summary judgment upon determining that "acted upon" and "implemented" are reasonably susceptible of more than one meaning. In *Chesapeake,* the Controller for the defendant had written an interoffice memorandum confirming his understanding of the NUS contract that " 'NUS does not benefit from improvements we implement on our own.' " The court explained that " '[i]mprovements we implement on our own' could refer to improvements which are completely unrelated to NUS's recommendations, to those which Chesapeake implemented notwithstanding NUS's recommendations, or those which Chesapeake thought of independently and which NUS recommended." *Ibid.*

■ The difference of opinion expressed in *Chesapeake* from that of the cases cited by NUS over the clarity of the terms in NUS' form contract suggests that those terms are indeed reasonably susceptible of another meaning. In fact, the Court finds that the entire first two sentences of paragraph three of the Agreement[5] are reasonably susceptible of another meaning. Moreover, Defendant's proffered evidence is relevant to prove what it purports the parties intended the terms in the Agreement to mean. *See Huntsman* Order, filed July 30, 1998 (noting that California law appears to be relatively liberal in its admission of parole evidence).

Therefore, Plaintiff's motion I to exclude the testimonies of Peter Huntsman, Lisa Lynn Anderson, Richard Rozman, and Brian Ridd is **denied.** Plaintiff's motion I to exclude Defendants Exhibits 5–8, 13, 15, 17, 204–208, 210–216, and 220 a–o is also **denied.**

B. *Motion II—French and Canadian Claims*

■ NUS seeks to exclude the testimonies of Huntsman witnesses Eades, Lali-

---

**4.** Only the portion of the *Savannah* Opinion and Order granting postjudgment interest at the rate of 9% was vacated and remanded.

**5.** *See supra,* section IA.

berte, Lardiere, Luyten, and Soultanian. NUS also seeks to exclude Huntsman Exhibits 34, 38, 43, 53, 69, 70, 71, 74–77, 80, 81, 84, 86, 87, 94, 95, 105, 107, 108, 109, 111, 113, 136, 140, 141, 145, 179, 180, 200, and 307.

### i. *French Claim*

On April 24, 1991, Huntsman Container Company France ("Huntsman France"), a French affiliate of Huntsman, signed an Agreement ("French Agreement") with National Utility Service France S.A., ("NUS France"), a French affiliate of NUS.

Pursuant to the French Agreement, NUS France recommended that Huntsman France purchase a compressor in order to save on its electric bill. Huntsman France claimed it had already made such a determination, but had not been able to locate a compressor and that it was waiting for Huntsman to approve the capital expenditure. Subsequently, a compressor was located and funds were allocated for its purchase. After Huntsman France purchased a compressor, it saved on its electric bills. NUS France claimed a share of the savings. Thereafter, NUS wrote a letter to Huntsman stating that it would drop its claim for a share of the Huntsman France savings because it desired to "maintain a good relationship" with Huntsman.

Huntsman seeks to introduce evidence pertaining to NUS' decision to drop its claim against Huntsman France to show that NUS engaged in a course of conduct consistent with Huntsman's interpretation of the Agreement. It states that it is not attempting to change the express terms of the Agreement as NUS would have the Court believe, but rather, to establish the meaning of the terms as understood by the parties and expressed by their actions. *See* Ca.Civ.P. § 1856(c); Ca.Com.Code § 2202(a) ("The terms set forth in a writing described in subdivision (a) may be explained or supplemented by course of dealing or usage of trade of by course of

performance.") Huntsman also characterizes the evidence it seeks to introduce as "admission against [NUS'] interest."

NUS moves to exclude evidence pertaining to NUS France's decision to drop its claim against Huntsman France on several grounds. First, NUS explains that its conduct does not "admit" that NUS France did not have a right to its share of the savings for the compressor recommendation; rather, as reflected in a letter to Huntsman, NUS was motived by a desire to "maintain[ ] a good relationship" with Huntsman because NUS wished to pursue the opportunities in Texas at issue in this lawsuit. What motivated NUS to drop its claim against Huntsman France, however, is not a matter of law that is proper for this Court to decide.

Next, NUS insists that the agreements between the foreign affiliates are separate and distinct from this litigation. The NUS form contract included a "Foreign Locations" rider. That rider provides,

> [t]his agreement and service fee also covers all present and additional foreign operations we acquire. You will submit recommendations for all possible savings and refunds on our cost of electricity, gas, oil and petroleum products, water sewerage, and steam. Our present foreign subsidiaries must sign a separate agreement ... within three (3) months from date hereof. Any of our present subsidiaries which delay taking advantage of your service beyond three (3) months from the date of this agreement, or in the case of new subsidiaries three (3) months from the date of acquisition, will be required to enter into a separate agreement and pay a service fee.

Huntsman also points out that all of NUS' foreign offices are managed by the same corporate officers and that NUS headquarters in New Jersey made all decisions regarding the French dispute. In essence, Huntsman urges that the Huntsman France contract is part of the Agreement, the NUS form contract.

In disputing Huntsman's contention, NUS relies on Judge Cavanaugh's finding that "NUS–France claims are distinct and separate from the within dispute." Opinion, dated April 2, 1998, at 4. In so finding, Judge Cavanaugh denied Huntsman's motion to compel the deposition of NUS' President and the production of his appointment schedule and travel records as evidence regarding the settlement of the French dispute. Huntsman's appeal of Judge Cavanaugh's decision was pending when the parties filed this motion *in limine*. Subsequently, this Court remanded the appeal to Judge Cavanaugh for reconsideration in light of this Court's denial of NUS' motion to strike Huntsman's Ninth Affirmative Defense.[6] *Huntsman* Order, dated July 30, 1998. In denying NUS' motion, this Court recognized that California law appears to be "relatively liberal in its admission of parole evidence," that there was evidence supporting Huntsman's interpretation of the terms of the Agreement, and that the "operative language of the parties' French contract is the same as the contract involved here." *Ibid.* Judge Cavanaugh, then also taking note that the "language of the French contract is the same as the contract involved in this matter," ordered production of the appointment schedule and travel records.[7] *Huntsman* Order, dated August 18, 1998, at 2. It is evident from these prior rulings that because the language in the Agreement is the same as that of the French Agreement, the French Agreement bears on the understanding of the parties with respect to the Agreement.

Finally, NUS asserts that a single instance does not constitute a "course of conduct" that may be used to explain or supplement a written agreement under Cal.Civ.P. § 1856(c) and Cal.Com.Code § 2202(a). Huntsman counters that on multiple occasions, NUS acknowledged that Huntsman's "prior knowledge" of a recommendation would foreclose NUS' right to share in savings. It states that in handling the French claim, NUS confirmed the relevance of the customer's "prior knowledge" and/or sought documentation regarding such "prior knowledge." Huntsman views as another occasion, NUS' handling of the Canadian claim[8] when NUS sought documentation regarding prior implementation.

While NUS may be correct that a single occasion does not constitute a "course of conduct," the Court agrees with Huntsman that the way in which NUS dealt with the French and Canadian claims as well as the claim underlying this suit is a "course of conduct" that may explain the terms of the Agreement. *See Huntsman* Order, dated July 30, 1998 (recognizing that California law appears to permit parol evidence regarding the parties' course of conduct prior to the litigation to establish the intent of the parties under the contract); *cf.* Ca.Civil Code § 1642 (several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction are to be taken together.)

ii. *Canadian Claim*

Huntsman Chemical Company of Canada, Inc. ("Huntsman Canada") signed an agreement that was accepted by National Utility Service (Canada) Limited ("NUS Canada") on May 15, 1991. On July 29, 1991, NUS Canada sent its Initial Energy Cost Analysis Report to Huntsman Canada. That report contained a recommendation for a tax refund. Shortly thereafter, Huntsman Canada informed NUS Canada that Huntsman Canada had already been granted a refund in January, 1991, four

---

**6.** Huntsman's Ninth Affirmative Defense seeks to offer parole evidence to show that it was the parties' understanding under the Agreement that NUS would not share in savings for ideas of which Huntsman had prior knowledge.

**7.** The NUS' President has passed away since the filing of the appeal of the Magistrate's decision.

**8.** *See* discussion *infra.*

months before the Canadian contract was executed. At NUS Canada's request, Huntsman Canada sent NUS Canada corroborating documents. NUS Canada acknowledged Huntsman Canada's prior implementation and did not pursue any claims against Huntsman Canada for that recommendation.

NUS contends that NUS Canada never dropped any claim because it never made any claim regarding the tax refund. NUS insists that the Canadian tax refund "beautifully illustrate[s]" the one circumstance in which NUS is not entitled to a share of the client's savings, that is, when the client has already implemented the course of action recommended by NUS. Assuming NUS' characterization of the Canadian claim to be true, NUS should welcome the opportunity to present to the jury this "beautiful illustration" of how the Agreement is to be understood.

Because the Court has found that the Canadian claim is part of NUS' "course of conduct," evidence pertaining to this claim will not be excluded. Moreover, deciding whether the claim was dropped because of "prior knowledge" as argued by Huntsman or whether, as NUS counters, no claim was ever pursued because the recommendation had already been implemented is not a question of law and does not bear on the interpretation of the contract, but rather, is a question of fact to be determined by the jury.

■ For the foregoing reasons, the Court finds that all evidence regarding the claims of NUS France and NUS Canada are relevant under F.R.E. 402 and therefore not a waste of time. Moreover, NUS summarily states that such evidence should be excluded under F.R.E. 403. Evidence may be excluded under F.R.E. 403 when its admission would lead to litigation of collateral issues, which might distract the jury from the main issues. *United States v. Dennis,* 625 F.2d 782, 797 (8th

Cir.1980). Only sparingly should evidence should be excluded under F.R.E. 403 because the evidence excluded is concededly probative. *United States v. Terzado–Madruga,* 897 F.2d 1099, 1117 (11th Cir.1990). Finally, the balance under the rule should be struck in favor of admissibility. *Id.; Dennis,* 625 F.2d at 797. The Court is unpersuaded that the prejudicial effect of the evidence that Huntsman seeks to introduction would substantially outweigh its probative value. In fact, the Court is inclined to believe that NUS seeks the exclusion of evidence under F.R.E. 403 simply because the evidence may be harmful to NUS. Therefore, NUS' motion to exclude the testimonies of Huntsman witnesses Eades, Laliberte, Lardiere, Luyten, and Soultanian and Huntsman Exhibits 34, 38, 43, 53, 69, 70, 71, 74–77, 80, 81, 84, 86, 87, 94, 95, 105, 107, 108, 109, 111, 113, 136, 140, 141, 145, 179, 180, 200, and 307 is **denied.**

C. *Motion III—Evidence Regarding NUS' Additional Recommendations*

i. *Recommendation to Investigate Alternate Pipeline*

■ At the crux of Motion III is the question of what NUS' recommendation to Huntsman actually was. Huntsman claims that NUS never recommended renegotiation of the Unit Gas contract in exchange for an extended term, but rather, suggested that Huntsman breach the Unit Gas contract and install an alternate pipeline into the plant and contract with a supplier other than Unit Gas. NUS subsequently located an alternative supplier, USA Gas, and arranged for USA Gas to visit Huntsman and to submit proposals to Huntsman. Therefore, Huntsman seeks to introduce evidence that it believes shows that NUS made those recommendations. Specifically, Huntsman argues that 1) the letters from NUS dated August 31, 1992,[9] Sep-

9. The August 31, 1992 that NUS sent Huntsman states in pertinent part:

"NUS feels that a credible threat of bypass would create proper leverage with Unit Gas

tember 19 and 24, 1992; 2) the proposals from USA Gas dated October 26 and 28, 1992; and 3) the testimony of several of Huntsman's witnesses show that NUS urged the installation of a second pipeline from a new supplier, USA Gas, and not renegotiation of the Unit Gas contract.

In contrast, NUS argues that evidence that Huntsman employees misconstrued the August 31, 1992 letter is irrelevant. NUS also posits that no jury is needed to interpret the August 31, 1992 letter.[10] It insists that the Court may interpret a letter where, as here, no reasonable jury could find that NUS did not recommend renegotiation of the Unit Gas contract and a strategy to improve negotiation leverage by creating a credible threat of bypass. NUS argues that according to those recommendations, what matters is whether the USA Gas proposal constituted a "credible threat of bypass" in that Unit Gas believed that Huntsman might acquire a better gas contract than the one which Huntsman had with Unit Gas at that time. NUS therefore contends that as long as Unit Gas' concern that Huntsman might choose another gas supplier played a role in Unit Gas' decision to renegotiate with Huntsman, NUS is entitled to payment for its recommendation.

NUS argues that evidence pertaining to any other recommendations NUS may have made should be excluded. Specifically, NUS suggests that what actions Huntsman actually took or should have taken

with respect to the USA Gas proposal are relevant only to NUS' "second recommendation."[11] Therefore, NUS seeks to exclude testimony or evidence that: (1) Huntsman did not enter into a contract with USA Gas; (2) it was not advisable for Huntsman to enter into a contract with USA Gas; and (3) it was not advisable for Huntsman to breach its contract with Unit Gas in order to enter into a contract with USA Gas. NUS argues that each of these points should be excluded under F.R.E. 403 because recommendations it may have made that Huntsman did not implement would merely confuse and mislead the jury.

Huntsman asserts that this Court may not interpret, as a matter of law, the August 31, 1992 letter because it presents a factual issue for the jury to determine. Further, Huntsman argues that because NUS' motion asks this Court to resolve a potentially dispositive and central factual issue, it is akin to a motion for summary judgment, for which the time to file has passed.

The Court agrees with Huntsman that the nature of NUS' recommendation cannot be determined by this Court as a matter of law.[12] *See Bonastia v. Berman Bros., Inc.*, 914 F.Supp. 1533, 1538 (W.D.Tenn.1995) (finding that in light of reasonable interpretations offered by both parties, letter was ambiguous and therefore the question of the parties' intent was an issue of material fact to be resolved by

in order to effect reductions in the present contract which does not run out until June 30, 1994. *In addition,* we also feel that it is not in the best interests of Huntsman Chemical to have only one source of supply. Should you be able to effect reductions in the Unit Gas cost contract in 1992 and 1993, circumstances may change which may make it impossible in the future to effect an alternate pipeline connection. Obviously the leverage would no longer be there without a permanent second pipe." (emphasis added).

10. NUS' reply brief specifically addresses only the admission of the August 31, 1992 letter into evidence.

11. It is unclear precisely what NUS considers to be the "second recommendation." The Court can only assume that the "second recommendation" is that Huntsman purchase gas from another supplier, USA Gas.

12. Because the Court finds the August 31, 1992 letter to be ambiguous, the Court need not address Huntsman's argument that this matter is more appropriately the subject of a summary judgment motion rather than a motion *in limine.*

the fact finder.) NUS argues that the phrase "in addition" used in the August 31, 1992 letter connotes an additional recommendation, separate and distinct from the prior sentence. That is, the recommendation that Huntsman create a credible threat of bypass is separate and distinct from the additional recommendation that with the money saved as a result of NUS' recommendation, Huntsman construct an alternate pipeline as an additional source of supply. The "in addition," however, could also be reasonably construed to signify simply another reason for constructing an alternate pipeline. This is a reasonable interpretation with which a jury could agree. The purpose of the August 31, 1992 letter is not, therefore, as NUS suggests, to confuse and prejudice the jury. Rather, Huntsman is entitled to present its case to a jury regarding a key dispute over what NUS recommended to Huntsman.

Because the Court cannot conclude as a matter of law what NUS' recommendations to Huntsman were, the Court also cannot conclude, as urged by NUS, that evidence pertaining to the alleged "second recommendation" is irrelevant. Accordingly, the Court declines to exclude testimony or evidence that: (1) Huntsman did not enter into a contract with USA Gas; (2) it was not advisable for Huntsman to enter into a contract with USA Gas; and (3) it was not advisable for Huntsman to breach its contract with Unit Gas in order to enter into a contract with USA Gas.

### ii. Statement Regarding Unit Gas Contract

NUS also seeks to exclude all evidence and argument regarding the advisability of breaching the Unit Gas Contract. By letter dated September 24, 1992, ("9/24 letter"), NUS' employee, G. Drosdowich wrote, "I am not an attorney, nor have I had an attorney review this contract, however the only remedy I see for Unit Gas if Huntsman Chemical chose not to purchase or take delivery under the Unit Gas Transmission Company contract would simply be for them (Unit) to terminate the contract."

NUS asks that this portion of the 9/24 letter be redacted. It contends that this statement is irrelevant because NUS did not recommend breach of the Unit Gas Contract, but renegotiation. It also argues that the statement is substantially more prejudicial than probative.

For Huntsman, however, Drosdowich's statement merely confirms and supports its claim that NUS recommended construction of an alternate pipeline in breach of the Unit Gas Contract rather than a renegotiation.

Because Drosdowich's statement bears on what Huntsman argues NUS' recommendation was, it is not irrelevant. In order to find that Drosdowich's statement is irrelevant, this Court would have to assume the facts as presented by NUS, that is, that NUS recommended a variety of proposals including renegotiation of the Unit Gas Contract. The Court also does not find that Drosdowich's statement is substantially more prejudicial than probative.

Therefore NUS' motion to exclude under F.R.E. 403 evidence and argument regarding the advisability of entering into a contract with USA Gas, whether Huntsman entered into a contract with USA Gas, and the advisability of breaching the Unit Gas Contract is **denied.**

### D. Motion IV—Evidence of Huntsman's Prior Knowledge and Independent Activities

Pursuant to F.R.E. 403, NUS seeks to exclude nineteen of Huntsman's witnesses: Bohall, Brickhill, Cable, Cox, Dowd, Drosdowich, Hardy, Huntsman, Nuir, Murray, Newman, Rasband, Reid, Ridd, Robinson, Turkington, Vance, R. Wood and To. Wood. NUS also seeks to exclude 35 of Huntsman's exhibits: 4, 9–11, 19, 66–68, 73, 82, 83, 85, 93, 99, 100, 106, 144–146, 148–152, 165, 172–175, 304, 305, 309, 310 and 322.

Because the Court has denied NUS' motion I and a jury may find that prior

knowledge of a recommendation made by NUS precludes NUS from sharing in the savings, evidence of Huntsman's prior knowledge and activities with respect to such knowledge is relevant; F.R.E. 403 does not preclude evidence that is prejudicial, but only evidence where the probative value is substantially outweighed by the prejudicial value, which is not the case here. Therefore, motion IV of NUS' motion *in limine* is **denied.**

E. *Motion V—Evidence Relating to Alleged Incidents of Water Problems in USA Gas' Natural Gas Occurring After February 8, 993*

█ NUS proposes to exclude the testimony of the following witnesses: Norm Cox, Peter Huntsman, Tom Muir, Brian Ridd, Brent Turkington, Robert Wood, Thomas Wood, Richard Newman, and the opinion witness Brickhill, an economist specializing in the natural gas industry. It also objects to the introduction of Huntsman Exhibits 155 and 162.

During the Unit Gas Contract, Unit Gas delivered gas from the Midcon Texas Pipeline Corp., f/k/a United Texas Transmission Company ("UTTCO") pipeline to Huntsman. USA Gas was delivering the gas produced by its Taylor Lake well field into the UTTCO pipeline upstream of the Unit Gas connection. It appears uncontested therefore, that a significant portion of the gas that Unit Gas provided to Huntsman was produced at USA Gas' Taylor Lake well field.

According to Huntsman, on November 8, 1993, the condensate tank overflowed causing a spill of "retrograde condensate" at the Taylor Lake field's "interconnect with the UTTCO pipeline." Huntsman's Opp.Br. at 44. Then on January 23, 1994, Huntsman contends it was "catching liquid" from the Taylor Lake well field. *Id.* at 45.

Huntsman seeks to introduce evidence of problems with USA Gas' natural gas to show that NUS' alternate pipeline strategy did not qualify as a "recommendation for savings" because implementing that idea would have caused Huntsman losses rather than savings. NUS, however, is not seeking damages for Huntsman's failure to implement this particular recommendation that Huntsman use USA Gas as an alternate supplier. Therefore, evidence pertaining to that claim is irrelevant. Accordingly, NUS' motion to exclude argument to the jury on the issue of the quality of USA Gas' production and the introduction of evidence from witnesses on that issue to show that NUS' alternate pipeline strategy would have made Huntsman lose money rather than incur savings is *granted.*

NUS, however, concedes that Huntsman may offer the evidence of alleged problems with USA Gas' natural gas in order to show that the USA Gas proposal was not a *credible* threat of bypass. NUS limits its concession contending that to the extent that Huntsman's evidence pertains to the alleged liquid in USA Gas' natural gas occurring after the Unit Gas Contract was already renegotiated, that evidence should be excluded. On February 8, 1993, Unit Gas issued a draft of the renegotiated Unit Gas contract, which contained the same reduced payment provisions as the final document circulated on June 10, 1993 and executed in December, 1993. Therefore, NUS contends that nothing that occurred after February 8, 1993, or at the latest June 10, 1993, could have had any impact on Unit Gas' decision to renegotiate its contract with Huntsman. Although Huntsman alleges that its employees had knowledge of problems with the quality of the USA Gas supply prior to the November 8, 1993 and January 23, 1994 events, NUS is correct that after Unit Gas and Huntsman had an agreement in place, whether finalized or not, any subsequent events should not have affected the renegotiation with Unit Gas. Huntsman has not established otherwise. Therefore, NUS' motion to exclude evidence regarding any alleged problems with the quality of USA Gas' natural gas that occurred after February 8, 1993 is **granted.**

F. *Motion VI—Presumption Regarding Continuity of Unit Gas Contract Price*

NUS contends that although the original Unit Gas Contract was to expire in June, 1994, it is entitled to a share of the savings from May 1993 through April, 1998.[13] It seeks a presumption that absent its recommendation for renegotiation, Huntsman would have renewed the Unit Gas Contract at the 1989 contract price. To argue the continuing nature of the contract, NUS relies on an "evergreen" provision in the Unit Gas Contract which states: "[t]his agreement shall ... automatically renew itself for successive terms of one (1) year each unless canceled by either party giving one hundred eighty (180) days written notice...."

Huntsman counters that damages should be measured only until June, 1994 because it would not have allowed the contract to renew at that time at above market rates.

The principle that the existence of a fact at a given time, if proven, gives rise to an inference that it continued until there is proof of a change is not "to be applied to all cases, with or without reason." *Maggio v. Zeitz*, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1948). "But whether such evidence is reliable enough for use is usually for the sound discretion of the trial court." *Conner v. Union Pacific Railroad Co.*, 219 F.2d 799, 802 (9th Cir.1955); *see also Brinson v. Hernandez*, 24 N.J. 391, 132 A.2d 289 (1957) ("it calls for the exercise of sound discretion by a trial judge according to the likelihood of the persistence of a fact under the circumstances of the case.")

Here, there is evidence that Huntsman had prior knowledge that it was paying above market rates. Ex. 10 attached to Affidavit of Peter J. Pizzi in Opposition to Plaintiff's Motion *In Limine*. This Court finds that it is not likely, nor is it within reason, to presume as a matter of law, that Huntsman, despite its knowledge that it was paying above market rates, would have renewed the Unit Gas Contract at the same above market rates. It is altogether possible that even though Huntsman did not procure an alternative proposal at a better price in 1992 or 1993, it would have done so in 1994 (whether from Unit Gas or another supplier), when the Unit Gas Contract expired. *See* WIGMORE ON EVIDENCE § 437 ("[w]hen the existence of an object, condition, quality or tendency at a given time is in issue, ... [t]he degree of probability of this continuance depends on the chances of intervening circumstances having occurred to bring the existence to an end. The possibility of such circumstances will depend almost entirely on the nature of the specific thing whose existence is in issue and the particular circumstances affecting it in the case in hand.")

Therefore, the question of the pricing structure in 1994 after the expiration of the original Unit Gas contract is to be decided by the jury; this Court **denies** NUS' motion for this Court to presume, as a matter of law, that "the pricing structure from the unamended 1989 Unit Gas contract would have continued through the NUS savings-share period."

G. *Motion VII—Testimony of John A. Brickhill*

NUS challenges the admissibility of the testimony of Huntsman's economic expert, Brickhill, on several grounds. NUS objects to each of the eight bulleted points addressed in Brickhill's expert report.

i. *Points I through IV, and VI*

Points I through IV and VI of Brickhill's report contain testimony regarding the following: 1) the recommendation made by NUS that Huntsman enter into a contract with USA Gas was ill-advised; 2) Huntsman had a contract with Unit Gas that would be regarded in the industry as binding; 3) the proposal made by USA Gas on

---

**13.** Paragraph 5b of the Agreement provides that Huntsman is to pay NUS fifty percent of each savings "secured for a period of sixty (60) months."

October 28, 1992 contained inadequate information; 4) ignoring the liability incurred if Huntsman broke the Unit Gas contract, the USA Gas proposal would be unacceptable to an end-user such as Huntsman; 6) Huntsman did not implement the recommendation made by NUS that Huntsman install a bypass pipeline. Brickhill's testimony essentially supports Huntsman's claim that its rejection of NUS' alternate pipeline proposal was proper.

First, NUS argues that it is not claiming compensation for its recommendation that Huntsman construct an alternative pipeline as an additional source of supply; therefore, all testimony pertaining to Huntsman's decision not to build a new pipeline is irrelevant.

Huntsman counters that Brickhill's testimony bears on what NUS actually recommended, which is a contested factual issue.[14] NUS has the better argument. Brickhill's conclusion regarding whether Huntsman's decision was proper or not is irrelevant to determining the disputed factual issue of what NUS' recommendations actually were.

As NUS concedes, however, Brickhill's testimony is relevant to Huntsman's contention that the USA Gas proposal did not constitute a "credible threat of bypass." Brickhill's testimony pertains to whether the alternate pipeline proposal was not in fact "credible" and therefore could not be used as leverage in renegotiations with Unit Gas.

Therefore, NUS' motion to exclude points I through IV and VI of Brickhill's expert report as irrelevant under F.R.E. 402 is **denied.**

### ii. Point V

In point V, Brickhill suggests that "NUS did not recommend that Huntsman renegotiate its contract with Unit." NUS argues that expert testimony is not required to aid in interpreting a letter. Huntsman

agrees. Therefore, this portion of NUS' motion is **granted.** Point V of Brickhill's expert report is inadmissible under F.R.E. 702.

### iii. Point VII

Brickhill states, in bulleted point VII, that "[a] USAgas bypass would not be deemed a threat by Unit." NUS claims that Brickhill is not qualified to make such a conclusion because he is not an expert Gas Marketer, Psychologist, or Behaviouralist.

Huntsman, however, counters that Brickhill's conclusion is not based upon the subjective beliefs of any particular employee of Unit Gas, but rather, is based on the economic theory of what a sophisticated gas marketer would do in similar circumstances. Huntsman emphasizes Brickhill's background in consulting for buyers and sellers of natural gas including contract negotiation and contract preparation.

Despite NUS' attempt to re-characterize the nature of what Brickhill will testify to, the Court finds that Brickhill's conclusion is grounded in economics, not psychology. In support of its proposition, NUS cites *F.T.C. v. Amy Travel Service, Inc.,* 875 F.2d 564 (7th Cir.1989). In that case, the court prevented an expert from testifying about consumer reaction to a sales pitch because it required an expert in consumer psychology or consumer behavior. Here, however, reactions of individual people are not at issue; rather, at issue is the response by a company, Unit Gas, based not on what it felt or thought, but on what the market conditions were. Therefore, NUS' motion to exclude point VII of Brickhill's testimony under F.R.E. 602 and 703 is **denied.**

### iv. Point VIII

In point VIII, Brickhill concludes that NUS' claim to damages, if any, should be "cut off after June 30, 1994, because the

**14.** *See supra,* II(C).

preexisting contract would have expired on its own terms and Huntsman would have received a price no higher than that in the renegotiated contract."

NUS contends that such testimony is objectionable on several grounds. First, it claims that "damages" is a legal term that the court must define. NUS' second objection is that Brickhill's testimony is based on a legally and factually incorrect assumption that the contract would have expired on June 30, 1994. Third, the underlying assumption that Huntsman would have contracted for its gas needs at market prices is speculative.

Huntsman counters that the *amount* of damages is a factual issue to be determined by the jury. It, of course, also states that the underlying factual premises of Brickhill's testimony are not only accurate and supportable, but the credibility of such facts can be assessed by the jury.

Huntsman is correct that the amount of damages can be decided by the jury; moreover, although the underlying factual premise upon which Brickhill's testimony is based may be speculative, NUS may, on cross-examination, elicit and challenge the underlying facts or data upon which Brickhill's testimony is based. F.R.E. 705. Therefore, NUS' motion to exclude this portion of Brickhill's testimony is **denied.**

H. *Motion VIII—Evidence That Huntsman Sells To Fina A Portion of the Steam Produced By the Combustion of The Natural Gas That It Purchases From Unit Gas*

■ Huntsman seeks to reduce NUS' damages figures by introducing evidence of "savings" that it passes on to a third-party, Fina Oil & Chemical ("Fina"). Huntsman states that a portion of the natural gas it purchases from Unit Gas is used to produce steam for Fina. As a result, Huntsman passes on a portion of the Unit Gas monthly invoice to Fina.

Huntsman alleges that it informed NUS of this arrangement at a meeting before NUS made its "recommendation" that Huntsman renegotiate the Unit Gas contract. Huntsman argues that because it is not actually realizing any "savings" for the portion of the monthly invoice passed through to Fina, that passed through amount should be excluded from NUS' damage figures.

As NUS argues, however, NUS is not responsible for how Huntsman uses its natural gas once it is purchased at a "savings." Huntsman did not ensure that any such exception be included in the Agreement. Any agreements with other parties, such as with Fina, is not relevant to the contract between Huntsman and NUS. Accordingly, pursuant to F.R.E. 402, NUS' motion to exclude evidence pertaining to the pass through of invoices to Fina is **granted.**

I. *Motion IX—Evidence That NUS Is "In The Business Of Litigation"*

■ Huntsman seeks to show evidence supporting its contention that NUS' "real business" is preparing for litigation. It argues that the frequency of litigation demonstrates that NUS is fully aware of the areas of confusion created by the form contract, yet the language of the form that has remained unchanged for over twenty-five years. Huntsman purports that NUS' frequent resort to litigation is highly probative to show lack of good faith.

NUS counters that such evidence is false, prejudicial and irrelevant. Moreover, it points out that the amount of litigation in which NUS is involved is insignificant relative to the amount of consultation work it performs.

The Court finds that evidence of NUS' prior litigation is irrelevant to determining the facts and issues in this suit.[15] NUS is

---

**15.** Whether evidence of other litigation is admissible on cross-examination or rebuttal to demonstrate that NUS' "good customer rela-

tions" rationale, *see supra* section IIB, is unworthy of belief has not been addressed by the parties nor by the Court. At this time, the

entitled to enforce what it believes are its rights under contract. Such decisions do not bear on its conduct in this litigation and is irrelevant under F.R.E. 402. Therefore, NUS' motion to exclude evidence that NUS is "in the business of litigation" is **granted.**

## III. *CONCLUSION*

For the foregoing reasons, Plaintiff NUS' motion I to exclude extrinsic evidence regarding the meaning of the Agreement is **denied;** motion II to exclude the French and Canadian Claims is **denied;** motion III to exclude evidence regarding NUS' additional recommendations is **denied;** motion IV to exclude evidence of Huntsman's prior knowledge and independent activities is **denied;** motion V to exclude evidence relating to alleged incidents of water problems in USA Gas' natural gas occurring after February 8, 1993 is **granted;** motion VI to presume, as a matter of law, the continuity of Unit Gas Contract price is **denied;** motion VII to exclude points I through IV and VI of Brickhill's expert report is **denied;** motion VII to exclude point V of Brickhill's expert report testimony is **granted;** motion VII to exclude point VII of Brickhill's expert report is **denied;** motion VII to exclude point VIII is **denied;** motion VIII to exclude evidence that Huntsman sells to Fina a portion of the steam produced by the combustion of the natural gas that it purchases from Unit Gas is **granted;** motion IX to exclude evidence in Huntsman's case in chief that NUS is "in the business of litigation" is **granted.**

An appropriate Order follows.

## *ORDER*

This matter having come before the Court on Plaintiff's motion *in limine* to exclude certain evidence; and

Court is only precluding Huntsman from offering evidence of frequent litigation in its

The Court having considered the submissions of counsel; and

The Court having decided the matter without oral argument pursuant to Fed. R.Civ.P. 78; and

For the reasons set forth in the Court's Opinion filed this day; and

For good cause shown;

IT IS on this 11th day of November 1999, hereby ORDERED that Plaintiff's Defendant NUS' motion I to exclude extrinsic evidence regarding the meaning of the Agreement is **denied;**

IT IS FURTHER ORDERED that motion II to exclude the French and Canadian Claims is **denied;**

IT IS FURTHER ORDERED that motion III to exclude evidence regarding NUS' additional recommendations is **denied;**

IT IS FURTHER ORDERED that motion IV to exclude evidence of Huntsman's prior knowledge and independent activities is **denied;**

IT IS FURTHER ORDERED that motion V to exclude evidence relating to alleged incidents of water problems in USA Gas' natural gas occurring after February 8, 1993 is **granted;**

IT IS FURTHER ORDERED that motion VI to presume, as a matter of law, the continuity of Unit Gas Contract price is **denied;**

IT IS FURTHER ORDERED that motion VII to exclude points I through IV and VI of John A. Brickhill's expert report is **denied;** motion VII to exclude point V of Brickhill's expert report testimony is **granted;** motion VII to exclude point VII of Brickhill's expert report is **denied;** motion VII to exclude point VIII is **denied;**

IT IS FURTHER ORDERED that motion VIII to exclude evidence that Huntsman sells to Fina a portion of the steam

case in chief.

produced by the combustion of the natural gas that it purchases from Unit Gas is **granted;**

IT IS FURTHER ORDERED that motion IX to exclude evidence in Huntsman's case in chief that NUS is "in the business of litigation" is **granted.**